Herbert Goldsworthy et al. [1] v. Commissioner. Goldsworthy v. Commissioner
Docket Nos. 55838, 55839, 59355, 59356.
United States Tax Court
T.C. Memo 1956-232; 1956 Tax Ct. Memo LEXIS 60; 15 T.C.M. (CCH) 1215; T.C.M. (RIA) 56232; October 23, 1956
*60 Petitioner operated a branch office of a construction firm. His contract with the firm, as evidenced by its terms and the action of the parties in its execution, entitled him to one-third of the net income from operations of that branch office, subject to a reduction in future years of one-third of the amount of net losses of any year as yet unrecovered by later net income. He was also required to leave in his account an amount equal to one-third the net investment in certain assets. This relationship terminated in 1949, and in 1952 petitioner paid the firm $55,000 in settlement of claims aggregating approximately $90,000. The claims made by the firm included a share of the loss suffered upon the disposition of assets used in the trade or business at the end of the relationship, as well as amounts allegedly withdrawn in excess of petitioner's share of the income, and a onethird part of the original operating capital. Held: 1. Petitioners' taxable income includes one-third of the net income of the branch office for each year during the existence of this relationship with the construction firm, less one-third of any net losses of prior years. 2. Petitioner has not shown that any *61 part of the foregoing payment of $55,000 was attributable to items includible in determining a net operating loss. Respondent is sustained in his refusal to permit the carry-back to 1951 of any net operating loss on account of that payment. 3. The evidence shows that in 1949 the business enjoyed a small net profit. Respondent erred in allowing a deduction for 1947 in his notice of deficiency of a net operating loss as a carry-back from 1949. W. W. Wallace, Esq., Hollingsworth Building, Los Angeles, Calif., for the petitioners. Arthur Clark, Jr., Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in the income tax of petitioners as follows: Deficiencies
Herbert
Nellie L.
Year
Goldsworthy
Goldsworthy
1946
$10,629.16
$10,629.16
1947
208.02
208.02
1948
3,784.29
3,784.29
1951
383.31
260.92
He has also determined overassessments in the income tax of each petitioner for the taxable year 1949 in the amount of $645.10, and an overassessment in the income tax of petitioner Herbert Goldsworthy for the taxable year 1952 in the amount of $70.67. No issue has been raised *62 with respect to the foregoing determinations of overassessments. By amended pleading, respondent has alleged error on his part in the allowance in the notice of deficiency of a carryback of a net operating loss deduction from the taxable year 1949 to the taxable year 1947. He has accordingly requested additional deficiencies in respect of the taxable year 1947. The principal issues before the Court are: (1) What was the amount taxable to petitioners as income in 1946, 1947 and 1948 as the result of a business relationship between petitioner Herbert Goldsworthy and James I. Barnes Construction Co., a partnership? (2) Did the payment in 1952 of $55,000 by petitioner Herbert Goldsworthy to the foregoing partnership in settlement of their respective accounts create a net operating loss which may be carried back as a net operating loss carry-back deduction to the taxable year 1951? (3) Did respondent err in allowing in the notice of deficiency the deduction in 1947 of a net operating loss carry-back from 1949? Findings of Fact A stipulation filed by the parties is hereby incorporated by this reference as a part of our findings. Petitioners were at all times relevant husband *63 and wife residing in Los Angeles County, in the State of California. They filed separate individual income tax returns for each of the taxable years in issue on the calendar year and cash basis with the then collector of internal revenue at Los Angeles. The returns were prepared on the community property basis, each petitioner including one-half of the income and one-half of the deductions of the community. Nellie Goldsworthy is a party to this proceeding solely as a result of the filing of the returns on a community property basis, and Herbert Goldsworthy will hereinafter be referred to as the petitioner. On December 28, 1944, petitioner entered into a written contract with James I. Barnes Construction Co. (hereinafter called "Barnes"), a partnership engaged in the heavy construction business, with its principal place of business at Logansport, Indiana. The contracting parties had been associated with each other since 1938, and the foregoing agreement represented the formalization of an existing relationship. The agreement provided that Barnes "agrees to employ" petitioner as manager of its Santa Monica, California, office. Petitioner was to receive 33 1/3 per cent of the net *64 earnings of that office, which are defined as net profits remaining after "all costs of operation and any losses that might be sustained." Net earnings were to be computed at the end of each calendar year on the basis of all work completed during such year. The contract further provided that Barnes should furnish initial working capital of as much as $25,000 "as a loan", to be repaid without interest out of the accumulation of earnings, and, in addition, also "as loans", any additional capital necessary, with interest "at the commercial rates prevailing." Interest on such "loans" was to be charged as a cost of operations. Equipment, real estate, and other assets required to carry on the business (hereinafter sometimes referred to as "fixed assets") were, according to the language of the agreement, to be "purchased out of the net earnings". In the same paragraph petitioner agreed "to leave a sum equal to 1/3 of the amount invested in said assets in his personal account at all times." The next paragraph of the agreement reads as follows: "All net earnings on completed contracts remaining after deducting amounts in fixed assets shall be divided in the proportion that each party *65 participates in the net earnings and set up in both parties personal accounts subject to their withdrawal, and all withdrawals made by either shall be charged against their accounts." Barnes had the right to direct the manner in which the books and records were to be kept, and generally supervise operations. Petitioner was required to keep Barnes informed of operations and to submit periodic reports. He could not submit bids or sign contracts without the prior approval of Barnes. Barnes had the right to terminate the contract on ten days' written notice. Petitioner, however, would thereafter retain the right to complete work in progress, after which "a full settlement between the parties shall be made so that each party shall receive the same proportion of any assets as such party is to receive from the profits as hereinbefore provided." Termination at petitioner's request would take effect "only after all work under contract has been completed, all monies collected and all fixed assets disposed of and the business of the branch office brought down to a cash basis." In case of petitioner's death, or his inability or refusal to perform his duties, Barnes had the right to take *66 over the assets and complete all work on hand, after which it would pay petitioner or those claiming through or under him "whatever proportion is due." The final provisions of the contract read as follows: "It is agreed that in case of the termination of this contract by either party that said second party shall establish sale prices on all items of equipment, real estate and other fixed assets at which he will buy or sell such assets and that the first party shall have the first choice of buying or selling. "It is agreed that this contract represents a merger of a verbal agreement between the parties existing from the time of the establishment of said branch office and is to cover all transactions from the beginning insofar as it affects the parties hereunto." Barnes is referred to in the contract as the "first party" and petitioner as the "second party". Neither petitioner nor Barnes ever represented that petitioner was a partner in the Barnes firm, or that he was a partner or joint venturer with Barnes in the operation of the Santa Monica office. Petitioner always signed as "Attorney in Fact" when signing on behalf of Barnes. The relationship of the parties was terminated *67 at the end of 1949. It does not appear from the record at whose option such termination occurred, or whether it was by mutual desire. As of December 31 of each of the years 1946, 1947 and 1948, the total investment of the Santa Monica office in fixed assets, less sales and abandonments, depreciation taken thereon, resultant book value, and one-third of the foregoing net investment, were as follows: Investment
Depreciation
(Less Sales &
(Current and
Year
Abandonments)
Prior Years)
Book Value
1/3 Thereof
1946
$161,718.08
$ 43,307.05
$118,411.03
$39,470.34
1947
292,028.82
68,122.77
223,906.05
74,635.35
1948
371,860.02
100,757.89
271,102.13
90,367.38
During the same years, net income of the Santa Monica office for the calendar year, and one-third thereof, were as follows: Year
Net Income
1/3 Thereof
1946
$163,471.96
$54,490.65
1947
207,560.60 *
69,186.87
1948
167,717.91 *
55,905.97
*68 In 1944 and 1945 the Santa Monica office sustained net losses, respectively, of $27,239.04 and $47,910.44. Petitioner was not personally liable for any part of such net losses. However, it was his and Barnes' understanding of their relationship that the amount otherwise due petitioner as the result of profitable results in future years would be reduced by one-third of the total of such losses, or $25,049.83. Accordingly, petitioner's interest in the earnings of 1946 was one-third of such earnings less that amount. The method of accounting employed by Barnes was to compute profit or loss on the completed contract basis, in the year in which the contract reached 90 per cent of completion. Petitioner would usually inspect work in progress from time to time, and submit periodic progress and cost reports. He followed Barnes' instructions in all accounting matters, including the year of computing profit or loss on contracts. In 1950 a firm of certified public accountants was employed by Barnes to audit the books of the Santa Monica office. The purpose of such audit was to determine the tax liabilities of the members of the Barnes firm resulting from the operations of that office. In *69 addition to various minor adjustments of the amount of profit or loss on various contracts, the accountants changed the year in which the net results of two contracts were reflected. In one instance the books had closed out a contract in 1947 and included in that year the resulting profit. In making this audit, the accountants eliminated that profit, as adjusted from 1947, and attributed it instead to 1949. In another instance the books had closed out a contract in 1949 and attributed the resultant loss to that year. The accountants determined that the contract had been completed in 1948, eliminated from 1949 the amount of the loss as adjusted by them, and attributed it instead to 1948. The books of the Santa Monica office did not err in respect of the years to which they attributed the net results of the foregoing contracts, and such results must be reflected in those years. Petitioner withdrew various amounts from the business from time to time. His contract with Barnes, as above noted, required him to maintain in his account an amount equal to one-third of the fixed assets (this requirement will hereinafter be referred to as the "asset requirement"). It also required that fixed *70 assets should be purchased out of net earnings, but this requirement was not met. Barnes directly purchased most of the fixed assets. As a result of various withdrawals by petitioner, the asset requirement was not fully satisfied during the years in issue. In his income tax returns for 1946, 1947 and 1948, petitioner included as salary income one-half of the amounts withdrawn by him. His wife included the other one-half in her returns for those years. During 1948 Barnes twice informed petitioner by letter that he was not meeting the asset requirement, and requested that he refrain from further withdrawals. After termination of the relationship between petitioner and Barnes, the fixed assets were sold at a substantial loss. Barnes made claims against petitioner in the approximate amount of $90,000. This claim included, inter alia, one-third of the loss sustained upon the sale of the fixed assets, a one-third share of the initial operating capital, and a debit balance in petitioner's account in the amount of $26,666. Petitioner and Barnes negotiated with respect to this claim and it was settled in 1952 by petitioner's payment of $55,000 to Barnes. Petitioner filed a claim for a net *71 operating loss carry-back deduction to the year 1951 as a result of that payment. Petitioner's taxable income from the Santa Monica office for 1946 consists of one-third of the net profit realized by that office in that year, less one-third of the total losses suffered during 1944 and 1945. His taxable income from that business for 1947 and 1948 consists of one-third of the net profits realized therefrom in each respective year. Petitioner's payment to Barnes in 1952 in the amount of $55,000 does not entitle him to a net operating loss carry-back deduction in his taxable year 1951. No net loss was sustained in 1949 as a result of the operations of the Santa Monica office. Respondent erred in allowing a net operating loss carry-back as a deduction in 1947. Opinion RAUM, Judge: 1. Much of the argument by both parties is directed to the question as to whether petitioner was a joint venturer or partner in the operation of the Santa Monica office, as determined by respondent, or merely an employee of Barnes, as contended by petitioner. The contract itself has features indicative of either relationship. In our view of the case, however, the ultimate result, for tax purposes, is *72 the same, so we do not find it necessary to decide this question. Irrespective of terminology of the contract or the ultimate classification of the relationship between petitioner and Barnes, the contract, as evidenced by its terms and the actions of the parties in its execution, shows that petitioner was entitled to onethird of the annual net income of the Santa Monica office, less one-third of any net losses sustained in earlier years and not yet fully recovered from subsequent net earnings. If, as claimed by respondent, petitioner was a partner or joint venturer in operating the Santa Monica office, he is taxable in each year to the extent of his distributable share of income, whether he received it or not. ; (C.A. 3); (C.A. 9); . If, on the other hand, petitioner is correct in designating himself as an employee, he is not thereby aided. There is no magic in labels, and we must, in such case, still determine what constituted his salary or compensation. If petitioner was *73 a partner or joint venturer, we are satisfied that his distributive share included one-third of the net income earned each year by the operations of the Santa Monica office. He was not personally liable to make up net losses for any given year, but in case of such net losses, his distributable share of the net income for succeeding years would be reduced by onethird of the amount thereof. This latter factor must be taken into effect with respect to the taxable year 1946. If petitioner is more properly viewed as an employee, his compensation consisted of one-third of the net profits for each year. Again, he was not personally liable for net losses, but such compensation in any given year was reduced by one-third of the unrecovered net losses of prior years, which will have an effect here upon the amount of the deficiency for the taxable year 1946. We do not view the asset requirement as affecting the amount of income taxable to petitioner. Petitioner, under his contract with Barnes, had an obligation to maintain in his account "a sum equal to" one-third of the investment in "fixed assets". Although the contract uses the words "leave a sum" it is apparent from a reading of the entire *74 contract and the actions of the parties in construing it, that the asset requirement was, in effect, a security deposit. Petitioner could not be required to deposit sums in excess of his total share of the net income, but once income had been earned the asset requirement came into operation. However, the actual source of the funds used to satisfy that requirement was of no moment. An amount was intended by that provision, rather than an amount from any specific source. Funds left by petitioner in his account to satisfy the asset requirement were in effect used by him in the satisfaction of a legal obligation. Such amounts constitute taxable income no less than had they applied to any other purpose. The very fact they were in petitioner's account shows that they were the property of petitioner. Application of such amounts to the asset requirement was a use by petitioner, whereby he enjoyed the economic benefit thereof, as owner. In this connection, it should be noted that the contract provides that upon termination a settlement is to be made whereby, inter alia, " each party shall receive the same proportion of any assets as such party is to receive from the profits as hereinbefore *75 provided." This provision, together with the requirement that fixed assets be purchased out of net earnings, seems a strong indication that petitioner had a one-third interest in such assets. If this be so, amounts represented by the asset requirement constitute petitioner's investment in fixed assets. He would then remain taxable on such amounts, since he had simply invested them, just as surely as an expenditure of such funds by him for any other purpose. If, on the other hand, we should agree with petitioner that he had no interest in the fixed assets, the conclusion is inescapable that he remained the owner of amounts left on deposit to satisfy the asset requirement. Upon termination of the relationship between himself and Barnes, his only liability was for one-third of the loss suffered in repect of such assets, not one-third of the total investment. Had there been no loss, no part of the amount represented by the asset requirement would have been affected. Barnes was not the owner both of the amounts represented by the asset requirement and the fixed assets themselves. It must necessarily follow that petitioner either had a one-third interest in the fixed assets, or title to *76 the amounts left in his account to satisfy the asset requirement, and that in such case the asset requirement was no more than a security deposit. It was not a reduction in his distributive or compensatory share of income. For the foregoing reasons, we cannot conclude that respondent erred in failing to reduce petitioner's taxable income because of the asset requirement. [2]
2. At the termination of their relationship Barnes made various claims against petitioner in the approximate aggregate amount of $90,000. This claim was comprised as the result of negotiations, and was settled by the payment of $55,000 in 1952. Petitioner claims that such payment represented a net operating loss, and has deducted a part of such amount as a net operating loss or carryback in respect of his taxable year 1951. Respondent has disallowed *77 such deduction. Whatever the precise nature of the business relationship between petitioner and Barnes, the operation of the Santa Monica office constituted a trade or business regularly carried on by petitioner. However, it appears that a substantial portion of the claim made by Barnes against petitioner represented a share of the loss on the ultimate sale of the fixed assets. A loss upon the sale of assets on termination of a business is not attributable to the operation of such business, and cannot create a net operating loss. Cf. (C.A. 8), certiorari denied, ; (C.A. 5); ; , affirmed, (C.A. 2). Moreover, a part of the claim included petitioner's share of the original capital investment. This is a capital investment and not a deductible expense. The loss sustained as a result of the necessity of making payment in respect thereof upon termination of the taxpayer's trade or business is no more attributable to the operation thereof than a loss *78 due to a disposition in liquidation of assets used in the trade or business. There is no evidence as to the precise nature of the settlement with Barnes, other than with respect to amount. We cannot find from the record that any part of the payment of $55,000 was in fact made in respect of items other than those which may not constitute part of a net operating loss. Accordingly, we cannot hold that respondent erred in disallowing the deduction in issue. 3. In determining the deficiency for the taxable year 1947, respondent allowed to each petitioner the deduction of a net operating loss carry-back from 1949 in the amount of $14,125.83. Respondent alleges this allowance to have been erroneous, and has requested increased deficiencies by appropriate pleadings. We think respondent has sustained his burden with respect to this issue. The evidence establishes that there was no net loss in 1949. We have rejected certain deviations from the books made by the accountants with respect to that year, and our determination in this respect considerably reduces 1949 income. Nevertheless, there remains a small net profit rather than any net loss for 1949, and it is apparent that respondent *79 was in error in permitting the deduction in question in his notice of deficiency. We do not understand petitioner to deny that the record clearly refutes the existence of a net loss of 1949. Counsel for petitioner has pointed out that the year 1949 is now closed by the statute of limitations, and seems to think that that fact is controlling. Counsel is in error therein. This issue relates not to the taxable year 1949, but rather to the taxable year 1947. To be sure, we must look at the facts of 1949 to determine what, if anything, may be carried back as a net operating loss deduction to 1947. We are not thereby opening the year 1949, and can find neither a deficiency nor an overpayment in respect of that year. The situation is no different from that which would prevail if petitioner had sold in 1947 an asset purchased in 1940, and there was an issue with respect to its basis. Assuming that 1940 was a closed year, we would nevertheless look into the transactions of that year to determine the basis of the asset, so that we might properly deermine the amount of gain in 1947. Here the year at issue is 1947. But the issue is whether respondent erred in allowing a net operating loss *80 deduction in 1947 as a carry-back from 1949. In order to decide that question we must determine whether a net operating loss was sustained in 1949. This relates to petitioner's income tax liability for 1947, not for 1949. It is amply established by the record that no net loss was suffered in 1949. There can accordingly be no carry-back from that year of a net operating loss deduction to 1947. The relief requested by respondent must be granted. Decisions will be entered under Rule 50. Footnotes
1. These proceedings include the following consolidated cases: Nellie L. Goldsworthy, Docket No. 55839; Nellie L. Goldsworthy, Docket No. 59355; and Herbert Goldsworthy, Docket No. 59356.↩
*. We have rejected certain reallocations of profit and loss from one year to another made by accountants auditing the books, for lack of evidence as to the correctness of such reallocations or the incorrectness of the allocations originally made by the books of the Santa Monica office.↩
2. Notwithstanding counsel's apparently conscientious and earnest efforts to present a clear picture, the record before us is in a state of confusion as to the actual relationship between petitioner and Barnes and as to the rights and liabilities existing between them. Our decision on the various issues presented represents our best judgment on the record as made.↩