Herbert GOLDSWORTHY and Nellie L. Goldsworthy, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15572.

United States Court of Appeals
Ninth Circuit.

Dec. 1, 1958.

Rehearing Denied Feb. 12, 1959.

Before LEMMON, CHAMBERS and BARNES,[1] Circuit Judges.

CHAMBERS, Circuit Judge.

On this review from a tax court decision we are primarily concerned with the income taxes of Herbert Goldsworthy and Nellie L. Goldsworthy, his wife, for the years 1946, 1947 and 1948 and with a loss carry-back from 1952 to 1951. All conclusions of the tax court were adverse to the taxpayer.

The James I. Barnes Construction Company (hereafter Barnes) was an Indiana partnership apparently engaged in heavy construction. Prior to 1944, Barnes had established a Western branch in Santa Monica, California. This branch was under the management of the taxpayer, Herbert Goldsworthy. The agreement of Barnes with taxpayer for his compensation was not reduced to writing until October 28, 1944. The agreement provided:

1. Goldsworthy was to receive one-third of the net profits on contracts completed [2] in each year.

2. Goldsworthy was responsible for no losses directly. But out of the next ensuing profits he first had to suffer a deduction to compensate for one-third of the past losses under his aegis.

3. All equipment was to be bought out of the Santa Monica net earnings. Goldsworthy was to leave in his account "a sum equal to one-third of the amount invested in said assets" (hereafter the equipment).[3]

Wallace & Wallace, W. W. Wallace, Los Angeles, Cal., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Myron C. Baum, Lee A. Jackson, Harry Baum, Attorneys, Department of Justice, Washington, D. C., for respondent.

1. Circuit Judge Dal M. Lemmon participated in the hearing of the case, but not in its decision. His death occurred on April 26, 1958.

2. In practice, instead of full completion the test was 90% of completion, apparently a common accounting practice in the construction industry.

3. * * * * *
Section 2 of the agreement inter alia, dealt with the acquisition of the equipment as follows:
"It is agreed that all construction equipment, real estate, notes and other fixed and moveable assets, required to carry on the business of this branch office shall be purchased out of the net earnings. The second party [Goldsworthy] agrees to leave a sum equal to ⅓ of the amount invested in said assets in his personal account at all times.
"All net earnings on completed contracts remaining after deducting amounts in fixed assets shall be divided in the proportion that each party participates in the net earnings and set up in both parties personal accounts subject to their withdrawal, and all withdrawals made by either shall be charged against their accounts. * * *"

4. Either party could terminate the arrangement at will but the agreement would continue as to incompleted contracts until they were fully performed.

5. At termination, provision was made for liquidating the equipment.[4]

Generally, after the signing of the contract with Goldsworthy, the business prospered, some years handsomely. However, it was terminated at the end of 1949, concluded in 1951, and in 1952 Goldsworthy settled for $55,000 claims of Barnes asserted against him for about $90,000. This sum of $55,000 gave rise to the loss carry-back issue.

The profits of the Santa Monica branch would indicate Goldsworthy was a good construction man, but both Barnes and Goldsworthy were extremely careless and cavalier about their basic agreement. Seemingly the system used (perhaps we abbreviate too much) was that when Goldsworthy "felt" the company was making a profit, by guess as to how much, he took out a dollar and sent Barnes two. Then each year Goldsworthy, dividing his income with his wife as he was entitled to do on a community basis, filed separate returns showing as income only that which had been withdrawn, otherwise ignoring the company books. He seems to have been perfectly honest about it.

Eventually Barnes raised the issue with Goldsworthy that he was not leaving enough in the partnership to take care of his required contribution to equipment. He would have to stop withdrawals until he caught up. Thus came the beginning of the end of a successful business friendship.

In the end, before the commissioner and the tax court the taxpayer contended that his salary was equal to his share of the profits less whatever was deductible therefrom as his "contribution" to equipment purchases.[5] As proof, he cited the

4. The duration and termination provisions of the contract were contained in Section 4 of the agreement as follows:

"This contract shall commence and be operative from and after the date first above given and shall continue in full force and effect until terminated by either party, as hereinafter provided.

"Said first party [Barnes] reserves the right to terminate this agreement at any time, after first giving said second party ten (10) days notice in writing of his intention to do so, but the party of the second part shall have the right to complete, under the supervision of the first party any unfinished work that might be under construction at that time and as soon as said work has been fully completed and paid for then it is agreed that a full settlement between the parties shall be made so that each party shall receive the same proportion of any assets as such party is to receive from the profits as hereinbefore provided.

"Should the second party request its termination it will be terminated only after all work under contract has been completed, all monies collected and all fixed assets disposed of and the business of the branch office brought down to a cash basis.

"In case second party should die, or become incapacitated, or should fail, neglect or refuse to carry out all agreements at the time and in the manner provided for herein, or as set forth in any contract made by him with others, then and in either of such cases said first party reserves the right to take over any and all uncompleted work and assume personal supervision thereof, including personal supervision of all equipment, machinery, tools and materials which might be on hand at that time as a result of this contract after which said first party shall pay said second party, his legal heirs, or representatives, whatever proportion is due said second party.

\* \* \* \* \*

"It is agreed that in case of the termination of this contract by either party that said second party shall establish sales prices on all items of equipment, real estate and other fixed assets at which he will buy or sell such assets and that the first party shall have the first choice of buying or selling."

5. Just how it could have been so that Goldsworthy had no interest in the assets or an amount on the books equivalent to one third of the value of the equipment we cannot understand in view of the express language of the contract quoted in footnotes 3 and 4. Perhaps the parties could have modified the agreement expressly during its operation or perhaps by conduct. But such we cannot verify, not even in the voluminous audit offered

fact that he got nothing from liquidation of the equipment and even had to contribute to this equipment account in his settlement: that necessarily a large portion of the $55,000 went for that purpose.

One of the issues in the case is whether taxpayer was an employee or a partner or a joint venturer. The tax court thought he was not an employee but felt the result would be the same if he were.

The tax court found the facts here a quagmire. We agree. They were utterly confused by Barnes and Goldsworthy during the life of the agreement. Apparently, they had not yet been the tragic victims of ruinous tax consequences flowing from not making their agreement clear cut and from careless observance of its terms.

In the ordinary case, we usually believe we owe the litigants and the bar our reasons for our decision. Here we think not.

Our conclusions are as follows:

■ 1. Goldsworthy was an employee at all times.

2. While he was employed, he nonetheless acquired in kind an interest of one-third in the fixed assets as they were purchased. (This concept of pro tanto interest was suggested by the tax court as a possibility.)

3. When assets were sold at a loss below their depreciated value in any year, Goldsworthy was entitled to take as a deduction one-third of the loss. If a profit on the sale was made, it was his too.

■ 4. Goldsworthy's taxable income in any year was not less than that which he took.[6]

5. Out of the $55,000 settlement made in 1952 Goldsworthy was entitled to have $26,666 treated as a loss he sustained in the business of selling his services and which he had to pay back because of previous overcollection of compensation. We think this amount can be clearly identified as an item to which he had no defense and that it is unreasonable to say the taxpayer failed to show an earmarking of this much money. As to the rest, $28,334, we can only call it a loss, a very real loss, but nothing we can classify as a loss for loss carryback.

6. The tax court must be sustained in its refusal to accede as to Goldsworthy to the accountant's shifting of completion dates on two contracts. Maybe the accountant was correct. The tax court could have accepted his testimony, but also it could have thought he didn't put enough base under his opinion to require its acceptance. It was permissible for the tax court to think the original completion dates contemporaneously selected by Barnes and Goldsworthy were more reliable.

We believe under the foregoing rulings that the taxes should be computable. At least we hope so. The taxpayer must accept the sore consequences of the failure to keep his relations with Barnes in a well defined form.

Reversed for proceedings consistent herewith.

as to the Santa Monica operation. Apparently this contention came up as the arrangement of the parties was falling apart. At least on the showing here one just finds no support for the proposition which would mean that if Goldsworthy bought enough equipment at Santa Monica he could never be entitled to any profit, although the profit was handsome. And the claim of Barnes at settlement seems to have been that while Goldsworthy didn't have to make good allowable depreciation on the assets he nonetheless had to reimburse Barnes for one third of the loss on sales of equipment: The difference between book value and actual sale price. Sardonically, the argument would run: Goldsworthy didn't depreciate the equipment fast enough or he was too slow in wearing it out.

6. See United States v. Lesoine, 9 Cir., 203 F.2d 123; United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560; Healy v. Commissioner, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007.

On Petition for Rehearing

Before CHAMBERS and BARNES, Circuit Judges.

PER CURIAM.

The taxpayer moves for a rehearing particularly with respect to our conclusion number 6 in the opinion. This concerns the refusal of the tax court to accept the accountant's shifting of completion dates of construction contracts during the tax years in question.

We are still not prepared to say the tax court should be reversed on this point. However, we do have an abiding doubt on the present state of the record as to whether justice has been done on these completion dates.

The case must go back and while it is in the tax court it should receive further evidence on the completion dates. Proper development of the facts, independently of the accountant's bald opinion, ought to point the way to a correct decision. Our decision should be understood as permitting and suggesting such a course.

With the foregoing explanation, the petition for rehearing is denied.