## CALUMET INDUSTRIES, INC. AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4580-87.          Filed September 13, 1990.

*Larry D. Blust, Paula Cozzi Goedert,* and *Kenneth L. Harris,* for the petitioners.

*William G. Merkle* and *Judith M. Picken,* for the respondent.

GERBER, *Judge:* Respondent, in a statutory notice of deficiency dated November 26, 1986, determined income tax deficiencies for petitioners' 1976 and 1979 taxable years in

the respective amounts of $24,461 and $141,451.20. The deficiencies concern the carryback of 1980 and 1981 net operating losses (NOL's) that resulted from deductions that have now been disallowed by respondent. After concessions, the issues remaining for our consideration are as follows: (1) Whether respondent is barred from assessing a deficiency attributable to an NOL carryback adjustment where the assessment period for the year to which the loss is carried back, and for which the deficiency was determined, is open by agreement, but the assessment period for the year in which the loss arose expired; (2) whether Calumet Industries Works, Inc. (Calumet Works), a subsidiary of petitioner Calumet Industries, Inc. (Calumet or petitioner), properly accrued in 1980 and 1981 expenses for real and personal property taxes in the total amount of $182,127; and (3) whether petitioner is entitled, under section 166,[1] to a $284,569 business bad debt deduction for 1980 which is attributable to certain payments made to or on behalf of its subsidiary, Stabiflex, Inc.

FINDINGS OF FACT

The parties' stipulation of facts is incorporated by this reference.

*Background*

Calumet is a corporation organized and existing under the laws of the State of Indiana which, at the time the petition in this case was filed, had its principal place of business in Gary, Indiana. Prior to December 31, 1980, petitioner was owned 20.079 percent by Philip Graziani and 79.921 percent by Graegin Industries, Inc. (Graegin Industries). Graegin Industries was owned, directly or indirectly, by Cecil Graegin and his son, Paul Graegin, who were also officers and directors of petitioner. Cecil Graegin was also Philip Graziani's uncle.

For the years 1976, 1977, 1978, and 1979 petitioner filed separate, nonconsolidated U.S. Corporation Income Tax Returns, Forms 1120. In those years, petitioner was en-

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the periods under consideration. All Rule references are to this Court's Rules of Practice and Procedure.

gaged in the business of fabricating steel products and performing steel mill maintenance.

On December 26, 1979, two corporations, Calumet Works and Calumet Industries Construction & Maintenance Corp. (Calumet Construction), were incorporated as wholly owned subsidiaries of petitioner to assume its major business activities. Calumet Works assumed petitioner's steel fabrication business and Calumet Construction assumed petitioner's steel mill maintenance business. Thereafter, and for all relevant periods herein, Calumet was engaged predominantly in the activity of providing administrative and management services.

For the taxable year 1980, petitioner and its subsidiaries, Calumet Works and Calumet Construction, filed a consolidated U.S. Corporation Income Tax Return, Form 1120, on a calendar year basis. Thereafter, petitioner and its subsidiaries became affiliated, for tax purposes, with the affiliated group of petitioner's parent, Graegin Industries, and its other subsidiaries, filing on a fiscal year ending June 30. For the short period from January 1, 1981, to June 30, 1981, petitioner, Calumet Works, and Calumet Construction were included in the consolidated U.S. Corporation Income Tax Return, Form 1120, of petitioner's parent, Graegin Industries, and its other subsidiaries for their fiscal year ended June 30, 1981.

*Period for Assessment*

On November 30, 1981, Graegin Industries and its subsidiaries filed a U.S. Corporation Income Tax Return, Form 1120, for the fiscal year ended June 30, 1981. This return reported a consolidated NOL in the amount of $436,793, allocable to the members of the Graegin affiliated group as follows:

|  | Taxable income (loss) |
|---|---|
| Graegin Industries | $(111,894.15) |
| Correct Piping Co., Inc. | 317,011.24 |
| Graegin Corp. | 459,228.14 |
| CAP Construction, Inc | (48,487.90) |
| Calumet | (236,972.96) |
| Calumet Construction | 362,407.05 |
| Calumet Works | (1,178,084.74) |
| Consolidated NOL | (436,793.32) |

On November 24, 1981, petitioner filed a Corporation Application for Tentative Refund, Form 1139, for 1979 with respondent. Petitioner sought to carry back $313,179.73 of the NOL for fiscal year ended June 30, 1981 (attributable to the corporations that were members of petitioner's former affiliated group, Calumet, Calumet Construction, and Calumet Works). On November 24, 1981, petitioner also filed a refund application for 1976. By carrying back the 1981 NOL deduction to 1979, petitioner "freed up" investment tax credit claimed in 1979. As a result, petitioner claimed an investment tax credit carryback from 1979 to 1976 in the amount of $24,461.21.

On June 30, 1985, the period for assessment, as extended by agreement, expired with respect to assessment of any income tax deficiencies against Graegin Industries and its subsidiaries for their fiscal year ended June 30, 1981. The period for assessment of petitioner's 1979 income tax was extended by agreement to June 30, 1987.

On November 26, 1986, respondent mailed petitioner a statutory notice of deficiency setting forth respondent's determination that petitioner had income tax deficiencies for 1976 and 1979 in the respective amounts of $24,461 and $141,451.20. As discussed in greater detail below, respondent disallowed $121,418 of a deduction claimed on the June 30, 1981, consolidated return of Graegin Industries and its subsidiaries which was attributable to accrued property taxes claimed by Calumet Works for the 6-month period from January 1, 1981, through June 30, 1981. Respondent also determined that, as a result of his adjustments increasing petitioner's taxable income for 1979, the investment tax credit carryback from 1979 to 1976 in the amount of $24,461 should be disallowed for 1976 and be reapplied to petitioner's tax liability for 1979. Thus, the notice of deficiency was mailed after the expiration of the assessment period for 1981, the year the NOL arose, but prior to the expiration of the assessment period for 1979, the year to which the loss was carried back.

## Accrued Rent Deduction Attributable to Property Taxes

On September 11, 1980, Calumet Works entered into a 5-year industrial facilities lease with United States Steel

Corp. (U.S. Steel). The lease provided that Calumet Works would lease U.S. Steel's American Bridge plant located in Gary, Indiana. The plant contained 1,820,955 square feet of utilizable space and equipment which Calumet Works was to rent under the lease. The plant included a machine shop, main shop, assembly building, weld shop, receiving and shipping yards, and various other smaller buildings. Most of the equipment was housed in the machine shop of the facility. The terms of the lease provided that Calumet Works would initially lease 74,960[2] square feet of space (consisting of the machine shop) commencing on October 1, 1980, to increase to 1,820,955 square feet by January 1, 1982, or sooner.

Under the lease, Calumet Works was required to pay a "minimum annual rental," "supplemental rent" (based on Calumet Works' profits), and all taxes associated with the real and personal property being leased. According to rider 2.01, the minimum annual rental was based on the following areas, rental rates per square foot of space, and the commencement dates at which given areas were to be leased:

| | Area rented (in sq. ft.) | Annual rent/ sq. ft. | Initial date of rent | Period at 50% rent |
|---|---|---|---|---|
| a. Machine shop | [3]73,680 | $1.50 | 10/1/80 | 3 months |
| b. Portion of main shop | 314,000 | 1.50 | 4/1/81 | 6 months |
| c. Balance of Premises | | | | |
| Office | 22,500 | 4.00 | 1/1/82 | - - - |
| Other Bldgs. | 955,182 | 1.50 | 1/1/82 | - - - |
| Receiving Yd. | 405,035 | .75 | 1/1/82 | - - - |
| Shipping Yd. | 49,278 | .75 | 1/1/82 | - - - |

[2]See *infra* note 3, where we explain how the square footage amount was later corrected by an amendment to the lease to read 73,680 square feet.

[3]As originally executed on Sept. 11, 1980, the lease provided that the machine shop measured 74,960 square feet. On Oct. 27, 1980, the lease was amended to indicate that the area of the machine shop was 73,680 square feet. Apparently, 1,280 square feet was erroneously allocated to the machine shop when it should have been included in the area of a building which was not yet being leased. The amendment provided, in pertinent part, as follows:

In Rider Article "2.01 - Minimum Annual Rental" the square foot area of the Machine Shop listed under item a. is to be changed from 74,960 s.f. to 73,680 s.f. The minimum annual rental for the Machine Shop will be based on this adjusted area.

The differential area of 1,280 s.f. is the boiler room building, which is attached to the southeast corner of the Machine Shop. The area of this building for the calculation of rent is to be included with the Culvert Plate Shop Building.

In the event Calumet Works desired to utilize any space described above in advance of the dates indicated, the lease provided that "Tenant shall promptly notify Landlord of any such increase in space requirements and the rental shall be adjusted accordingly as of the date of change in space utilized. In such event, the rental rate shall be 50% of the annual rent for up to six (6) months, except that the reduced rent shall not extend beyond 12-31-81."

During the next few months, Calumet Works began utilizing additional space prior to the dates indicated in the lease. On March 1, 1981, the lease was amended to include 64,809.45 square feet of the main shop in the leased premises. On April 1, 1981, the lease was amended to include an additional 308,812.50 square feet of the main shop and 80,116.35 square feet of the receiving yard in the leased premises. On July 1, 1981, the lease was again amended to include an additional 73,386 square feet of the main shop and 3,751 square feet of an administration building in the leased premises. According to an architect's sketch attached to the July 1, 1981, lease, it appears that Calumet Works, at that point, was utilizing and renting approximately half of the total space in the main shop.

Calumet Works was obligated to pay, as additional rent, real and personal property taxes on the leased facility, as follows:

3.01. Taxes

Tenant shall pay as additional rent for the Premises,[4] all taxes and assessments, general and special, utility rates and all other impositions, ordinary and extraordinary, of every kind and nature whatsoever, which may be levied, assessed or imposed upon the Premises, or any part thereof, or upon any improvements at any time situated thereon, accruing or becoming due and payable during the term of this Lease, including any taxes imposed upon the rentals due hereunder; provided, however, that general taxes levied against the Premises shall be prorated between Landlord and Tenant as of the Commencement Date for the first Lease Year and as of the expiration date of the Lease for the last Lease Year, all on the basis of the then most recently ascertainable real estate tax bills.

*     *     *     *     *     *     *

4By reference in the lease to "Rider 1.01-Equipment," the terms "Premises" and "Leased Premises" apparently have been construed by the parties as including, in addition to the real property, the equipment, machinery, and other personal property that were the subject of lease.

### 3.04. Separate Assessment

In the event that Tenant cannot directly pay said taxes and other costs to the proper authorities because the Premises or property are not separately assessed by the proper assessing authority, Landlord shall promptly pay all such taxes and costs and Tenant shall reimburse Landlord within ten (10) days of receipt of Landlord's statement of Tenant's liability which shall be determined by the proportion the square footage or other applicable measurement of the Leased Premises or property bears to the total square footage or other applicable measurement of the assessed property, as determined by landlord's tax department.

Calumet Works' tax obligation under the lease was calculated on a pro rata basis until December 31, 1981, as follows:

### Rider 3.05 - Proration for Space Utilized

For the period from the Commencement Date until December 31, 1981, said taxes shall be prorated to Tenant on the basis of space utilized as described in Rider 2.01. Thereafter, Tenant shall pay taxes on the total leased premises.

U.S. Steel disputed the 1980 assessment of real and personal property taxes with respect to the American Bridge facility. As a result, Calumet Works used the 1979 real and personal property tax liabilities of $268,903 and $162,164, respectively, as the basis for estimating the tax portion of its rent deductions for 1980 and fiscal year ended June 30, 1981.

Robert Selva, a certified public accountant and treasurer of Graegin Industries, prepared the 1980 and fiscal year ended June 30, 1981, consolidated income tax returns, which included Calumet Works. Selva also prepared Calumet Works' computations and journal entries for the tax accrual deductions for its allocable portion of the leased facility's real and personal property taxes for 1980 and fiscal year ended June 30, 1981. Selva computed the 1980 real estate tax based on an estimate that 30 percent of the facility's land and buildings had been used by Calumet Works. Selva computed the 1980 personal property tax based on an estimate that Calumet Works used 80 percent of the machinery, equipment, and other personal property available on the premises. Selva made the assumption that, like the rent attributable to the real property tax, the rent attributable to the personal property tax was based on the

percentage of use. Selva had no personal knowledge regarding Calumet Works' actual usage of space and personal property at the American Bridge facility.

For 1980, a year in which Calumet Works was an affiliated member in petitioner's affiliated group, Calumet Works accrued and deducted $60,709 as its allocable share of the 1980 real and personal property taxes for the leased facility for the period October 1, 1980 (lease commencement date), through December 31, 1980 (the end of the taxable year). The accrual was computed as follows:

| | |
|---|---:|
| Total 1979 real estate (R.E.) tax | $268,903 |
| Estimated percent of R.E. used by Calumet Works in 1980 | 30% |
| R.E. tax based on 12 months for R.E. used | 80,671 |
| Percent of year R.E. used by Calumet Works (Oct. 1, 1980, through Dec. 31, 1980) | 25% |
| Total accrued 1980 rent allocable to R.E. tax | 20,168 |
| | |
| Total 1979 personal property (P.P.) tax | $162,164 |
| Estimated percent of P.P. used by Calumet Works in 1980 | 80% |
| P.P. tax based on 12 months for P.P. used | 129,731 |
| Percent of year P.P. used by Calumet Works (Oct. 1, 1980, through Dec. 31, 1980) | 25% |
| Total accrued 1980 rent allocable to P.P. tax | [1]40,541 |
| | $20,168 |
| | [1]40,541 |
| Total accrued 1980 rent allocable to R.E. and P.P. tax | 60,709 |

[1]Although this amount was used by Calumet Works, it is incorrect mathematically. The correct figure based on 25 percent is $32,433.

For the short period from January 1, 1981, through June 30, 1981, when Calumet Works was included as an affiliated member in the consolidated return of Graegin Industries for the fiscal year ended June 30, 1981, Calumet accrued and deducted $121,418 as its allocable portion of the 1981 real and personal property taxes on the leased facility. This accrual was computed by doubling the $60,709 amount previously claimed by Calumet Works for 1980 because the relevant time period for 1981 was 6 months (January 1, 1981, to June 30, 1981) and not 3 months as was used in the 1980 calculation (October 1, 1980, to December 31, 1980). In this calculation, the same assumptions and estimates were employed as those used for the 1980 tax accrual deduction. Thus, because a math error was made in

Calumet Works' computation of its 1980 tax accrual deduction, as conceded by petitioner, Calumet overstated its tax accrual deduction for the taxable period ended June 30, 1981, by $16,216.

On October 18, 1982, U.S. Steel billed Calumet Works for an amount it determined was Calumet Works' share of the real and personal property taxes on the leased facility. These amounts were $3,744 for the period from October 1, 1980, to December 31, 1980, and $84,828 for the calendar year 1981. U.S. Steel based its calculations, for both the real and personal property taxes, upon the percentages of *floor space* utilized by Calumet Works, as were indicated under the lease and subsequent amendments during these periods.

Respondent, by a notice of deficiency dated November 26, 1986, disallowed Calumet Works' 1980 and 1981 accrued tax deductions. In the notice, it was explained that petitioner had not established that the amount of the accruals could be determined with reasonable accuracy as of the end of the taxable years at issue or that the deductions represent reasonable accruals for the years claimed.

*Bad Debt Deduction*

Petitioner, during 1975, entered into a 50/50 joint venture with Maschinen und Werkzeugban GmbH (M&W Dortmund), a German corporation, to form M&W Industries for the purpose of marketing a product described as "quick roll changing machinery" in the United States. M&W Dortmund was owned solely by Karl Kirchhoff (Kirchhoff), a resident of the Federal Republic of Germany and a business acquaintance of Calumet's executives.

In 1976, Kirchhoff introduced the product "stabiflex energy carriers" (stabiflex) to petitioner with the prospect of jointly manufacturing and marketing the product in the United States. Stabiflex was an experimental type of flexible piping or cable carrier used to encase and protect moving machine parts and electrical, air, and hydraulic fluid lines on machine tools and heavy equipment. This product was unique to the U.S. market because other cable carriers were not fully enclosed. Petitioner and M&W Dortmund

agreed to pursue this venture and to share the expenses of the stabiflex business on a 50/50 basis.

Philip Graziani (Graziani), an officer and shareholder of petitioner, was assigned to obtain an exclusive license from Katrapat A. G. Suisse, the holder of the Stabiflex patent, to manufacture and market the stabiflex energy carrier product in the United States and then to run the stabiflex business. C.G.C., Inc., was formed and on or about July 21, 1976, its authorized shares of stock were issued, 500 shares to Calumet and 500 shares to Kirchhoff or his designee. Subsequently, C.G.C., Inc., entered into an exclusive license and know-how agreement with Katrapat for the manufacture, application, and sale of stabiflex energy carriers for the United States and Canada.

On July 26, 1977, Stabiflex, Inc., was incorporated to assume the stabiflex license from C.G.C., Inc., and to take over the development, manufacture, and sale of the product. On September 29, 1977, Stabiflex, Inc., issued 50 percent of its stock to petitioner and the remaining 50 percent to M&W Dortmund. Each party agreed to make a $5,000 capital contribution to Stabiflex, Inc., in exchange for 500 shares of $1 par stock.

Graziani incorporated Stabiflex, Inc., and he remained the sole director of the corporation through December 31, 1980, and thereafter, continued as a member of its board of directors until approximately January 4, 1982. Graziani was also president from Stabiflex, Inc.'s incorporation through 1981. Additionally, Graziani represented Calumet's stock interest in Stabiflex, Inc., from 1977 through 1980.

During the period from 1977 until its liquidation in 1982, Stabiflex, Inc., held the exclusive license for the manufacture, application, and sale of stabiflex for the United States and Canada. On August 11, 1977, in a status report to M&W Industries, Stabiflex, Inc., reported that $15,921.21 of the product had been sold and projected sales of $50,000 for 1977, $300,000 to $400,000 for the second year, and $1 million for the third year. The status report also noted problems, including the possibility that the stabiflex raw material may rust in storage; the need for a clean work area in which to manufacture and store the product; and the lack of quality information being provided by Katrapat regard-

ing the product's physical limitations, application data, and manufacturing problems. In this regard, Joseph L. Devitt, Stabiflex, Inc.'s manufacturing and marketing representative, advised Graziani to establish facilities to assemble, store, and package the product. He also advised that $74,700 would be needed for these and other operating expenses for the balance of 1977.

During the period from January 1, 1977, through August 27, 1977, petitioner incurred and paid $26,716 in expenses with respect to stabiflex. On August 29, 1977, Graziani, on behalf of petitioner, requested that Kirchhoff and M&W Dortmund pay $13,358 as reimbursement to petitioner or 50 percent of the expenses paid by petitioner in connection with the product. Graziani also requested that M&W Dortmund pay $5,000 as its capital contribution in Stabiflex, Inc., and an additional $37,500 as its share of operating expenses for the remainder of 1977.

Prior to September 30, 1977, petitioner incurred and paid $30,066.36 in expenses on behalf of Stabiflex, Inc., and had transferred $15,784 in cash to Stabiflex, Inc.'s bank account for a total of $45,850.36. Of this amount, $5,000 represented petitioner's contribution of capital for Stabiflex, Inc., stock. M&W Dortmund agreed to contribute $45,850.36, of which $5,000 was paid to Stabiflex, Inc., on October 17, 1977, as its capital contribution, and the balance ($40,850.36) was paid to Stabiflex, Inc., on February 16, 1978, for future operating expenses. Petitioner's 1977 books and records reflected a $5,000 investment in and a $40,850.36 account receivable due from Stabiflex, Inc. On Stabiflex, Inc.'s 1977 income tax return, these amounts were treated as $5,000 paid for capital stock and a $40,850 loan payable. Likewise, on its 1977 balance sheet, Stabiflex, Inc., reflected $10,000 in the capital stock account and $40,850 as loans payable to stockholders. Stabiflex, Inc., paid no interest on the advances in 1977. The $40,850.36 to be "lent" by M&W Dortmund was not reflected on Stabiflex, Inc.'s records or tax return until received in 1978. This amount was reflected on Stabiflex, Inc.'s books and 1978 tax return as a $40,851 loan from M&W Dortmund, increasing to $81,701 the total of loans from shareholders shown on the 1978 return.

Petitioner performed services and provided materials to Stabiflex, Inc., and the amounts due for those services and materials were shown, separately from the shareholder loans, as an account payable on Stabiflex's books. These amounts were shown as accounts receivable on petitioner's books. For 1978, these dealings resulted in accounts receivable of $54,356.11.

During 1979, petitioner provided an additional $61,028.53 in services and materials to Stabiflex, Inc. Consequently, petitioner's account receivable ledger showed a combined 1978 and 1979 account receivable due from Stabiflex, Inc., of $115,384.64 ($54,356.11 + $61,028.53). This amount was in addition to the initial advance of $40,850.36 and was reflected on Stabiflex, Inc.'s books and 1979 tax return as an account payable to Calumet. Petitioner expected that it would be repaid for its advances of cash, materials, and services from Stabiflex, Inc.'s earnings and profits.

Petitioner's advances of cash, material, and services were made for Stabiflex, Inc.'s continuing working capital requirements. Petitioner treated its advances as accounts receivable instead of capital contributions in order to avoid the inconvenience of causing Stabiflex, Inc., to issue more shares each time additional capital was needed from its shareholders. Prior to December 31, 1979, Stabiflex, Inc., was unable to borrow money or establish lines of credit from any bank without petitioner's guarantee. Stabiflex, Inc., had no collateral and had to rely upon petitioner's financial strength.

During 1979, Kirchhoff informed Graziani that he wanted his company, M&W Dortmund, to be "bought out" of its interest in Stabiflex, Inc. On March 30, 1979, Graziani obtained a loan in petitioner's name from a commercial bank in the amount of $133,334. The proceeds of this loan were paid to M&W Dortmund on behalf of Stabiflex, Inc., for purposes of buying out its interest in Stabiflex, Inc. On May 29, 1979, petitioner repaid the bank loan in full. Petitioner's books and records reflected the $133,334 paid to M&W Dortmund as a $5,000 investment in and a $128,334 miscellaneous receivable due from Stabiflex, Inc. Stabiflex, Inc., reflected the $128,334 as an account payable to petitioner. This amount represented the repayment of

M&W Dortmund's February 16, 1978, advance to Stabiflex, Inc., in the amount of $40,850.36, with the remainder representing the payment for engineering services and material provided by M&W Dortmund to Stabiflex, Inc. As a result of repaying the advance from M&W Dortmund, Stabiflex, Inc., reduced the amount shown on its 1979 tax return as loans from stockholders by $40,850.36. Thus, in total, Stabiflex, Inc.'s records and tax return reflected an account payable to petitioner of $284,569, representing its initial advance of $40,850, its 1978 and 1979 advances of $54,356.11 and $61,028.53, respectively, and the final advance connected with the buy-out of M&W Dortmund of $128,334.

During the period under consideration, Stabiflex, Inc., did not execute any formal loan agreements or notes payable with regard to the $284,569 and no payments were made to Calumet with respect to this "liability." No interest was charged or paid and no due date was established for the repayment of the advances. Calumet did not demand repayment or attempt to collect the advances from Stabiflex, Inc.

During 1980, a management dispute arose between Graziani and the other directors and shareholders of petitioner. Graziani strongly opposed Calumet Works' entering into the American Bridge facility lease with the guarantee of petitioner. The parties were unable to settle their differences and as a result Graziani requested that his stock interest in petitioner be bought out.

Sometime about April 1980, petitioner began negotiations with Graziani for the redemption of his shares in petitioner. In these negotiations, petitioner was being represented by Donald Morfee (Morfee), an industrial and financial consultant. Morfee, a friend and business acquaintance of Cecil Graegin, was also a director of Calumet during 1980.

On September 9, 1980, Graziani requested that petitioner's board of directors accept his offer to exchange his 20.079-percent ownership interest in Calumet for 20.079 percent of Calumet's assets in kind, specifically including 100 percent of the Stabiflex, Inc., shares. The board took no action on this proposal at that time.

The negotiations between Morfee and Graziani ended sometime during the fall of 1980. On December 31, 1980, Graziani purchased all the outstanding shares of Stabiflex, Inc., from petitioner for $10,000, with all intercompany liabilities due to petitioner being eliminated. In this regard, the stock purchase agreement between petitioner and Graziani stated as follows:

(f) No amount is due by Stabiflex to Seller. Seller represents and warrants that it has previously written off as uncollectible all amounts due by Stabiflex to Seller and has released such obligations. The parties agree that Stabiflex would have a negative net worth but for such writeoff and would be insolvent and unable to pay such obligations and that the Shares would, but for such write-off, be worthless.

Graegin, as president of petitioner, executed a general release dated December 31, 1980, which acknowledged that petitioner released and discharged Stabiflex, Inc., from any intercompany liabilities it owed to petitioner, which included the $284,569 receivable due from Stabiflex, Inc. Consequently, petitioner's books and records for the year ended December 31, 1980, no longer reflected any investment in or any receivable due from Stabiflex, Inc. Soon after Graziani purchased the outstanding stock of Stabiflex, Inc. (1,000 shares), he transferred a majority of the stock to other individuals, with the resulting ownership of Stabiflex, Inc., as follows:

| | |
|---|---:|
| Philip J. Graziani, Sr. | 450 shares |
| Lynn E. Graziani | 450 shares |
| Philip J. Graziani, Jr. | 50 shares |
| Joe Szpatowski | 50 shares |
| | 1,000 shares |

On its consolidated financial statements and consolidated income tax return for the year ended December 31, 1980, Calumet reported a bad debt deduction in the amount of $284,569, representing the former receivable due from Stabiflex, Inc.

Stabiflex, Inc., had gross sales for 1980 of $675,204, net income of $160,962, and interest expense of $8,950. Stabiflex, Inc.'s balance sheet for 1980 reflected the following:

*Assets*

| | |
|---|---:|
| Cash................................................ | $113,090 |
| Accounts receivable................................. | 144,408 |
| Inventories......................................... | 68,314 |
| Other current assets ............................... | 1,258 |
| Loans to stockholders............................... | 27,760 |
| Depreciable assets (net) ............................ | 8,086 |
| Security deposit .................................... | 720 |
| Total assets .................................... | 363,636 |

*Liabilities and stockholder's equity*

| | |
|---|---:|
| Accounts payable.................................. | $113,405 |
| Common stock..................................... | 10,000 |
| Paid in capital.................................... | 284,293 |
| Retained earnings .................................. | (44,062) |
| Total........................................... | 363,636 |

Stabiflex, Inc., recorded the release of the $284,569 inter-company liability as a reduction of its accounts payable and a contribution to capital, reflecting the transaction on its 1980 balance sheet as an increase to "Paid in of capital surplus" in the amount of $284,293. Respondent, in his November 26, 1986, notice of deficiency, determined that petitioner's $284,569 bad debt deduction was not allowable under section 166. He explained the determination as follows:

> The $284,569 bad debt deduction shown on your 1980 return as resulting from a transfer of funds to Stabiflex, Inc. is not allowable under Section 166 of the Internal Revenue Code because the cancellation of the purported debt constitutes part of the cost of treasury stock you acquired through the redemption of your capital stock previously owned by Philip J. Graziani, Jr. If, however, it is found that the cancellation was not made in partial consideration for the acquisition of treasury stock, the claimed deduction is not allowable because the funds transferred were contributions to capital instead of loans. If, however, it is found that the transfers constituted true debt, it has not been established that the debt became worthless during 1980.

## OPINION

### Period for Assessment

Initially we address whether respondent is barred from assessing a deficiency resulting from his adjustment of an NOL deduction where the assessment period for the year in which the loss was generated had previously expired, but

the assessment period for the year to which the loss is carried back is open by agreement.

Section 6501(a) provides the general rule that the amount of any tax imposed by the Internal Revenue Code shall be assessed within 3 years after the return was filed, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of that period. Section 6501 also provides numerous, nonexclusive exceptions to the general 3-year limitations rule which extend, sometimes indefinitely, the period within which respondent may assess a tax.[5] One such exception is contained in section 6501(c)(4), which provides that assessment periods may be extended by agreement. Section 6501(c)(4) contains the following:

(4) EXTENSION BY AGREEMENT.—Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

Additionally, section 6501 includes a provision that extends the assessment period in situations where an NOL carryback is at issue. Under those circumstances, section 6501(h) provides that "In the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback * * * , such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss * * * which results in such carryback may be assessed." In other words, if the year in which the NOL arose is open, then the year to which the NOL is carried back is also open for purposes of assessing a deficiency attributable to the carryback. See also sec. 6501(m). Section 6501(h) effectively extends the assessment period for a deficiency that is based on the disallowance of an erroneous or improper loss carryback until the assessment period for the tax year of the loss has expired. Without section 6501(h),

---

[5]These exceptions apply in situations which include the filing of a false or fraudulent return with the intent to evade tax, the willful attempt to evade tax, or the failure to file a return. In these circumstances, assessment may be made at any time. See sec. 6501(c)(1), (2), and (3). See also sec. 6501(e) and (f), which provides for a 6-year assessment period in certain cases.

the assessment period for the carryback year would likely be closed or closing about the time the NOL deduction is being carried back.

In the present case, petitioner and its subsidiaries, Calumet Works and Calumet Construction, joined the affiliated group of Graegin Industries and subsidiaries on January 1, 1981. For the fiscal year ended June 30, 1981, a year not in issue, the Graegin affiliated group incurred an NOL of $436,793.32, mostly attributable to petitioner and its subsidiaries. Petitioner then carried back $313,179.73 of that NOL to its 1979 taxable year, a year that remains open by agreement, and claimed a tax refund. By carrying back the 1981 NOL deduction to 1979, petitioner "freed up" investment tax credit that had been claimed in 1979. As a result, petitioner claimed an investment tax credit carryback from 1979 to 1976 in the amount of $24,461.21 and also claimed a refund for 1976.

A portion of the $313,179.32 NOL deduction was attributable to a $121,418 deduction accrued by Calumet Works as its portion of U.S. Steel's tax liability associated with the American Bridge facility for the 6-month period from January 1, 1981, through June 30, 1981. As a result of respondent's disallowance of the $121,418 deduction claimed by Calumet Works, the amount of the NOL carryback to petitioner's 1979 taxable year was reduced and the investment tax credit carryback to 1976 was eliminated. (If we find that the assessment period for the NOL carryback had not expired, there is no dispute on the timeliness of respondent's determination regarding his disallowance of the investment tax credit carryback.)

The assessment period for the year in which the NOL deduction arose (fiscal year ended June 30, 1981) expired, pursuant to an agreement, on June 30, 1985. The assessment period for 1979, however, had not yet expired. The notice of deficiency for 1979 was dated November 26, 1986, a date after the expiration of the assessment period for the 1981 year and before the expiration of the assessment period for the 1979 year.

Petitioner argues that under section 6501(h), a deficiency attributable to an NOL carryback should be assessed *only if* the taxable year within which the NOL arose is still open for

assessment. Once the period of limitations for the taxable year in which the NOL arose expires, the period of limitations for assessing a deficiency attributable to the NOL carryback also expires. Thus, according to petitioner, under section 6501(h), a deficiency attributable to the NOL carryback from fiscal year ended June 30, 1981, should have been assessed by June 30, 1985; therefore, the notice of deficiency dated November 26, 1986, is untimely. Petitioner contends that it is irrelevant that the assessment period for 1979, the year to which the NOL is carried back and the year for which respondent determined the deficiency at issue here, had not expired. Petitioner argues that although section 6501(c)(4) allows the assessment period to be extended by agreement, as executed by the parties for 1979, respondent failed to adequately extend the assessment period for the fiscal year ended June 30, 1981, the critical year under section 6501(h). See generally *Centennial Savings Bank FSB v. United States*, 670 F. Supp. 195 (N.D. Tex. 1987); see also *Pesch v. Commissioner*, 78 T.C. 100, 134 n. 57 (1982).

Respondent, on the other hand, simply argues that he has recomputed petitioner's 1981 NOL only for the purpose of determining petitioner's income tax liability for 1979. Respondent does not seek to assess any deficiency for petitioner's 1981 tax year. We agree with respondent. As more fully discussed below, we hold that 1979 is an open year and respondent is not time barred from assessing a deficiency in that year even though it resulted from the disallowance of an NOL carryback from 1981, a closed year. Section 6501(h) does not have exclusive applicability in all NOL carryback situations. Pursuant to section 6501(c)(4), the parties agreed to extend the assessment period for 1979, and section 6501(h) does not nullify that agreement or shorten the agreed-upon period.

It has long been held that we may determine the correct amount of taxable income or NOL for a year not in issue (whether or not the assessment of a deficiency for that year is barred) as a preliminary step in determining the correct amount of an NOL carryover to a taxable year in issue. *Lone Manor Farms, Inc. v. Commissioner*, 61 T.C. 436, 440 (1974), affd. without published opinion 510 F.2d 970 (3d Cir.

1975) and cases cited therein. The same principle applies regarding the carryover of an investment tax credit. See *Mennuto v. Commissioner*, 56 T.C. 910, 923 (1971), and cases cited therein. These cases were generally based upon a rationale involving section 6214(b) and its predecessor, section 272(g) of the Internal Revenue Code of 1939. Section 6214(b) provides, in pertinent part, as follows:

SEC. 6214(b). JURISDICTION OVER OTHER YEARS AND QUARTERS.—The Tax Court, in redetermining a deficiency of income tax for any taxable year * * * shall consider such facts with relation to the taxes for other years * * * as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year * * * has been overpaid or underpaid.

In substantially similar circumstances, we stated in *Goldsworthy v. Commissioner*, T.C. Memo. 1956-232, revd. on other grounds 262 F.2d 435 (9th Cir. 1958):

Counsel for petitioner has pointed out that the year 1949 is now closed by the statute of limitations, and seems to think that that fact is controlling. Counsel is in error therein.

This issue relates not to the taxable year 1949, but rather to the taxable year 1947. To be sure, we must look at the facts of 1949 to determine what, if anything, may be carried back as a net operating loss deduction to 1947. We are not thereby opening the year 1949, and can find neither a deficiency nor an overpayment in respect of that year. * * *

[15 T.C.M. 1215, 1220, 25 P-H Memo T.C. par. 56,232 at 987 (1956); see also *Reilly v. Commissioner*, T.C. Memo. 1989-312.]

Similarly, this issue was addressed in *Pacific Transport Co. v. Commissioner*, T.C. Memo. 1970-41, vacated and remanded on other issues 483 F.2d 209 (9th Cir. 1973). In that case, the assessment periods were extended by agreement for the taxable periods in which the Commissioner determined deficiencies, 1957 and 1958. The parties did not extend the limitations period for taxable year 1959, which consequently closed. In determining the deficiencies for the taxable periods in 1957 and 1958, the Commissioner determined that there was no NOL in 1959 and, therefore, none to carry back to the 1957 and 1958 taxable periods. The taxpayers, who were affiliated corporations, argued that because 1959 was a barred or closed year, the Commissioner was barred from recomputing the 1959 NOL deduction for

purposes of making determinations regarding the amount of any 1959 NOL deduction that could be carried back to the taxable periods that were at issue, 1957 and 1958. In dismissing the taxpayers' argument, we stated the following:

It was held in *State Farming Co.* [40 T.C. 774 (1963)] that the Commissioner could recompute the amount of a taxpayer's income or loss for a closed year where such computation was for the purpose of ascertaining what amount, if any, of net operating loss of a closed year was available for carrying over or carrying back to an open taxable year. We pointed out in *State Farming Co., supra,* pp. 781-783, that "[r]ecomputations of barred years' income for determinations of net operating loss carrybacks have been upheld as proper", citing *Phoenix Coal Co. v. Commissioner,* 231 F.2d 420 (C.A. 2), affirming a Memorandum Opinion of this Court, and *Commissioner v. Van Bergh,* 209 F.2d 23 (C.A. 2). We stated, further, that this Court "may consider such facts of other years as may be necessary to a proper determination of a deficiency for an open year. * * * ."

In these cases, respondent's determinations with respect to the closed year 1959 were only for the purpose of ascertaining whether there was a net operating loss for 1959, and the amount thereof, which could be carried back to the open taxable periods, 1957 and 1958, so as to be deducted from the income of those taxable periods. Under the reasoning of *State Farming Co., supra,* and the cases cited there, it is held that respondent was not barred by the statute of limitations from recomputing the amount of the 1959 net operating loss of Pacific Transport and its subsidiaries; and that he was not barred from making the determinations involving the deductions claimed by New States so as to ascertain the correct amount of the net operating loss of New States for 1959, if any.

[29 T.C.M. 133, 162, 39 P-H Memo T.C. par. 70-041 at 186-187 (1970).]

Similarly, the Court of Appeals for the Ninth Circuit held, on appeal, that the bar of the statute with respect to 1959 did not prevent the Commissioner from determining the deficiencies for 1957 and 1958, which arose as a result of the disallowance of the 1959 NOL deduction. *Pacific Transport Co. v. Commissioner,* 483 F.2d at 214. Likewise, the appellate court held that although 1959 was a closed year, the Commissioner was not barred from making recomputations of the amount of income, or loss, for 1959 for purposes of making determinations of the amount of any allowable NOL carrybacks from 1959. *Pacific Transport Co. v. Commissioner, supra* at 214-215. Thus, the conclusions of the above-cited cases are entirely consistent with our

holding here: respondent is not barred from assessing a deficiency for an open year where his determination does not concern additional assessments for a barred year, but only review of a computation from a barred year for the purpose of correctly determining the tax liability for an open year.

Although the reasoning of *Pacific Transport,* the cases cited therein, and the other above-cited cases would normally be dispositive of the statute of limitations issue in the present case, those cases did not address the significance or applicability of section 6501(h). Because petitioner here contends that section 6501(h) can effectively shorten the limitations period for assessing a deficiency attributable to an NOL carryback for a year that otherwise remains open by agreement, we feel compelled to extend our analysis as it relates to this issue.

Section 6501 is a "statute of limitations" provision. The standard for interpreting such a provision has been established by the Supreme Court in *Badaracco v. Commissioner,* 464 U.S. 386, 391-392 (1984):

> Our task here is to determine the proper construction of the statute of limitations Congress has written for tax assessments. This Court long ago pronounced the standard: "Statutes of limitations sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government." *E.I. Dupont de Nemours & Co. v. Davis,* 264 U.S. 456, 462 * * * (1924). See also *Lucas v. Pilliod Lumber Co.,* 281 U.S. 245, 249 * * * (1930). More recently, Judge Roney, in speaking for the former Fifth Circuit, has observed that "limitations statutes barring the collection of taxes otherwise due and unpaid are strictly construed in favor of the Government." *Lucia v. United States,* 474 F.2d 565, 570 (1973).

Section 6501(h) first appeared in the Internal Revenue Code as section 276(d) of the Internal Revenue Code of 1939. Congress enacted section 276(d) to provide the Government with sufficient time to assess a deficiency resulting from the carryback of an NOL to an earlier year. The legislative history behind section 276(d) contains the following explanation:

> In general a tax must be assessed within three years from the date the return for a taxable year is filed. Such period under present law is sometimes, and as a result of the amendments made by section 5 of the bill in the case of credits or refunds will be frequently, insufficient in the

case of deficiencies attributable to net operating loss carry-backs * * * .
[H. Rept. 849, 79th Cong., 1st Sess. 29 (1945), 1945 C.B. 566, 586.]

The legislative history contains the reasoning that "the events which give rise * * * to deficiencies attributable to carry-backs do not occur until after the close of the taxable year, and in some cases may not occur until a considerable number of years thereafter." H. Rept. 849, *supra*, 1945 C.B at 585. Consequently, the Government generally did not have available, under prior law, the information necessary to make an assessment for deficiencies resulting from carrybacks during part or all of the 3-year period within which such assessment was to be made. Accordingly, section 6501(h) and its predecessor, section 276(d), were enacted to provide the Government with a longer period to determine and assess a deficiency attributable to an NOL carryback. H. Rept. 849, *supra*.

Therefore, we are not persuaded by petitioner's argument that section 6501(h) can *shrink* the limitations period for a deficiency year that is otherwise open. Congress enacted section 6501(h) and its predecessor, section 276(d), to enlarge the assessment period for that deficiency, not to preempt or contravene a provision like section 6501(c)(4) that allows for a longer assessment period. Section 6501(h) was meant to address the typical NOL carryback case—where, but for section 6501(h), the limitations period for the year to which an NOL is carried back would expire before the limitations period for the year the NOL is incurred. There is no support for the belief that section 6501(h) and its predecessor, section 276(d), were intended to preclude respondent from determining and assessing a deficiency for a year that is open, without qualification, by agreement because the deficiency is attributable to an NOL that is carried back from a closed year. Therefore, we hold that section 6501(h) does not cause a shortening of the assessment period for a year that otherwise remains open even if all or part of the deficiency for that year is attributable to the carryback of an NOL deduction from a closed taxable year. So long as the period for assessment is open under some provision in the year under consideration, we have jurisdiction to consider all items that may affect that taxable year. This is supported by the legislative history of

the Revenue Act of 1945,[6] which, in discussing section 276(d), provided as follows:

If the period within which a deficiency may be assessed under any other applicable provision of law is longer than the period provided in section 276(d), a deficiency attributable to a carry-back may be assessed at any time prior to the expiration of such longer period. [S. Rept. 655, 79th Cong. 1st Sess. 32 (1945), 1945 C.B. 621, 646.]

It is also significant that section 6501(h) and most of the other section 6501 exceptions to the general 3-year assessment period use the permissive term *"may* be assessed [within a specified time if certain circumstances are present]." (Emphasis added.) In contrast, the general 3-year rule under section 6501(a) and the exception under section 6501(d) use the mandatory term *"shall* be assessed [within a specified time]," with certain exceptions. (Emphasis added.) This is strong indication that Congress intended that the exceptions with the "may be assessed" language, such as section 6501(h), would not be exclusive; that other exceptions allowing for longer assessment periods would apply if their requirements were also met.

Moreover, in cases where the parties entered into extension agreements under section 6501(c)(4) and respondent determined deficiencies attributable to NOL deduction carrybacks, the courts did not even reach section 6501(h). In those cases, the applicable assessment period was determined to be the longer period provided under the agreement. See *Pacific Transport Co. v. Commissioner,* 483 F.2d at 214-215; *Goldsworthy v. Commissioner,* T.C. Memo. 1956-232, revd. on other grounds 262 F.2d 435 (9th Cir. 1958).

In the present case, the assessment period with respect to petitioner's 1979 taxable year was extended by agreement, as provided under section 6501(c)(4). Therefore, it is irrelevant that respondent's deficiency determination for 1979, the open year, was attributable to the carryback of an NOL from 1981, a year that closed prior to the mailing of the deficiency notice. The assessment period agreed upon by the parties under the provisions of 6501(c)(4), which is longer than the period prescribed under 6501(h), is the relevant

---

[6]Pub. L. 214, 79th Cong., 59 Stat. 556.

period here. It also seems appropriate that by agreeing to extend the limitations period for 1979, without qualification, petitioner waived any and all defenses with respect to the limitations period for the 1979 deficiency, in whole or in part. *Stange v. United States,* 282 U.S. 270 (1931); *Piarulle v. Commissioner,* 80 T.C. 1035, 1042 (1983).

## Accrued Rent Deduction Attributable to Property Taxes

Next we consider whether Calumet Works properly accrued $182,127 as its portion of the real and personal property taxes for the American Bridge facility for 1980 and 1981.

Section 461(a) provides that the amount of any allowable deduction shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income. The regulations further provide that a taxpayer using an accrual method of accounting may deduct an expense for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. Sec. 1.461-1(a)(2), Income Tax Regs. While no accrual shall be made where all the events which fix the liability have not occurred, the fact that the exact amount of the liability cannot be determined will not prevent the accrual so long as it can be computed with reasonable accuracy. Sec. 1.461-1(a)(2), Income Tax Regs.

The American Bridge facility lease provided that Calumet Works would lease U.S. Steel's American Bridge facility and certain equipment. The equipment was housed within the facility, mostly within the area encompassing the facility's machine shop. The lease provided that Calumet Works was to pay, as part of its rent, a pro rata portion of the real estate and personal property taxes for the premises. The lease provided that for the period at issue, October 1, 1980, through June 30, 1981, the taxes were to be prorated to Calumet Works on the basis of the space utilized by Calumet Works to the total space available. The agreement provided that, initially, Calumet Works would lease 74,960 square feet of space commencing on October 1, 1980, to increase, under a schedule, to 1,820,955 square feet by January 1, 1982, or sooner. If Calumet Works desired to

utilize additional space, in advance of the time prescribed under the schedule, the lease provided that "Tenant shall promptly notify Landlord of any such increase in space requirements and the rental rate shall be adjusted accordingly as of the date of change in space utilized." Consequently, as Calumet Works utilized more space, the lease was amended to reflect the increased usage.

Calumet Works accrued and deducted $60,709 and $121,418 as its share of the real and personal property tax liability for the periods from October 1, 1980 (the date the lease commenced), through December 31, 1980, and January 1, 1981, through June 30, 1981, respectively. Because U.S. Steel was disputing the local taxing authority's 1980 and, apparently, 1981 property tax assessments, Calumet Works computed its accrued portion of the taxes based upon the 1979 property tax assessment.

For purposes of its deduction, Calumet Works estimated that it was utilizing 30 percent of the space available in the American Bridge facility for purposes of calculating its portion of the real property tax and 80 percent of the personal property for purposes of calculating its portion of the personal property tax for the above periods. Those estimates were substantially larger than the amounts set forth in the lease terms and amendments thereto, which purported to reflect the portion being leased.

Following the resolution of the dispute regarding the 1980 property tax assessment, U.S. Steel billed Calumet Works $3,744 for the period from October 1, 1980, through December 31, 1980, and $84,828 for the calendar year 1981. U.S. Steel's calculations, for the real and personal property tax assessments, were based upon the percentage of floor space utilized by Calumet Works, as indicated under the lease and subsequent amendments.

Respondent does not dispute the reasonableness of basing the 1980 and 1981 property tax accruals on the 1979 tax figures,[7] but argues that Calumet Works should have done

---

[7]Respondent, in his opening brief, states as follows:

The petitioner's liability for additional rents in regards to the real estate and personal property taxes on the American Bridge facility for the 1980 and fiscal 1981 tax years were susceptible to accrual with reasonable accuracy for those periods. Calumet Works knew the amount of real estate and personal property taxes assessed and paid by U.S. Steel for the American Bridge facility's 1979 tax year. * * * Their lease agreement provided that U.S. Steel

two things differently in computing the 1980 and 1981 accruals. First, Calumet Works should have based the amount accrued for its portion of the real property tax upon the amount of space utilized by Calumet Works, as indicated in the lease and the lease amendments. Second, respondent contends that Calumet Works should have based the amount accrued for personal property taxes on the square footage of *real* property utilized, rather than on the percentage of *personal* property utilized; respondent focuses on the fact that the lease provided that all taxes imposed upon the "Premises" would be prorated based on the amount of space utilized.

With respect to the real property tax accrual, petitioner contends that although the lease and the lease amendments expressly indicated the square footage of space being leased by Calumet Works, Calumet Works actually was using more space, 30 percent of the available space, to be specific. Thus, according to petitioner, its portion of the real property tax was correctly calculated using 30 percent as the amount of space utilized. We agree with respondent.

Petitioner, in support of its position, offered the testimony of Robert Selva, the CPA who prepared the computations and journal entries for Calumet Works' 1980 and 1981 tax accrual deductions. Selva had no knowledge of the amount of space Calumet Works was actually utilizing during 1980 or 1981. Petitioner has not substantiated the 30-percent estimate. We hold that the most probative evidence is the lease, including amendments.

Under the lease, which was amended concurrently with any increased use of space, Calumet Works did not reach the 30-percent level until July 1, 1981,[8] subsequent to the periods under consideration. Additionally, the tax bill sent

would prorate their portion of the real estate and personal property tax liability to them on the basis of square footage used to total square footage available for 1980 and 1981. * * * Their lease agreement and its amendments provided the varying amounts of space (squarefootage) utilized by Calumet Works during the 1980 and the fiscal 1981 tax years. * * * From this information, they could have computed with reasonable accuracy their portion of the taxes for which they would have been reasonably liable for 1980 and 1981. It would only be reasonable to assume that the 1980 and 1981 tax assessments would have been no less than the 1979 tax assessed on the leased facility. Thus, Calumet Works could have computed its liabilities for the taxes on the American Bridge facility with reasonable accuracy for 1980 and 1981, pursuant to Treas. Reg. Sec. 1.461-1(a)(2).

[8] $\frac{73,680 + 64,809 + 388,929 \text{ sq. ft.}}{1,820,955 \text{ sq. ft.}} = 29.1 \text{ percent}$

by U.S. Steel for Calumet Works' portion of the 1980 and 1981 real and personal property taxes is probative evidence which also supports our holding that the terms of the lease and amendments thereto are a reasonable basis for apportionment of the accrued property tax and that petitioner's method was not reasonable.

Concerning the personal property tax, petitioner's computations were based on the percentage of personal property Calumet Works was utilizing. We hold that this method was reasonable under the circumstances. The lease, as it related to personal property taxes, was not a model of clarity. It was a real estate lease modified to incorporate the rental of equipment by Calumet Works. Because real property taxes were calculated based upon the real property utilized, Calumet Works interpreted the lease to require the same approach for the personal property tax. It was reasonable under these circumstances to assume that U.S. Steel would expect Calumet Works to pay personal property taxes based upon the amount of equipment it utilized. The intent of the parties was for Calumet Works to pay any and all taxes associated with the property, both real and personal, it was using. The fact that U.S. Steel ultimately billed Calumet Works for its share of the personal property tax on the basis of *real* property utilized and not on the basis of *personal* property utilized, does not mean that the original accrual was calculated under an incorrect or unreasonable method. There was no evidence reflecting that Calumet Works and U.S. Steel had an express or implicit understanding, outside the terms of the lease, that the personal property taxes would be apportioned based on the amount of real property utilized. Respondent's reliance on the parol evidence rule is inappropriate here because the lease was not clear on this matter. As we have found, the lease in this case was drafted primarily for the rental of real estate, not for equipment or other personal property. Although the lease was modified by the use of riders to take into account the rental of the personal property, it was left ambiguous on how the personal property tax would be apportioned between Calumet Works and U.S. Steel. Accordingly, we hold that it was reasonable and appropriate for Calumet

Works to compute its personal property tax accrual based on the percentage of personal property utilized.

Although we agree with petitioner's method of calculating the personal property tax accrual, there is insufficient evidence to substantiate Robert Selva's estimate that Calumet Works used 80 percent of the personal property located at the American Bridge facility during 1980 and 1981. Petitioner failed to supply a list of the equipment that was being rented, although such a list was referenced in the lease as "Exhibit B." Thus, we decline to accept petitioner's usage estimate.

There is no dispute that Calumet Works utilized some of the equipment located in the American Bridge facility, particularly the equipment housed in the machine shop. Our evaluation of the percentage of personal property utilized by Calumet Works during the periods at issue bears heavily against petitioner, "whose inexactitude is of [its] own making."[9] *Cohan v. Commissioner,* 39 F.2d 540, 544 (2d Cir. 1930). We hold that from October 1, 1980, to June 30, 1981, Calumet Works used 50 percent of the personal property; from March 1, 1981, to June 30, 1981, Calumet Works used 55 percent; and from April 1, 1981, to June 30, 1981, Calumet Works used 65 percent.

*Bad Debt Deduction*

The final issue for consideration is whether petitioner is entitled, under section 166, to a business bad debt deduction in 1980 in the total amount of $284,569 on account of payments made to or on behalf of its subsidiary Stabiflex, Inc.

Section 166 provides for deductions against income for business bad debts that become worthless during the year. To be entitled to the deduction, the taxpayer must prove the existence of a bona fide debtor-creditor relationship which obligates the debtor to pay the taxpayer a fixed or determinable sum of money. A gift or contribution to capital cannot be considered debt. *Kean v. Commissioner,* 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs.

---

[9]Because the personal property tax was based on the assessed value of the property, our percentage approximations are also based on that method.

Respondent argues that the advances to Stabiflex, Inc., in this case were capital contributions when made and, therefore, no genuine debt existed to which section 166 is applicable. Alternatively, respondent contends that, assuming arguendo that the advances were valid loans, petitioner's voluntary cancellation of the debt in December 1980, in contemplation of the sale of the Stabiflex, Inc., stock, constituted a contribution to capital at that time. As a second alternative argument, respondent contends that if a bona fide debt was created, the debt did not become worthless in 1980, or at any time. Petitioner contends that the advances and accounts receivable gave rise to debt obligations which became worthless in 1980, thereby prompting the applicability of section 166.

Each case involving the question of whether a payment is debt or equity for Federal tax purposes must be decided on its own facts. *Segel v. Commissioner,* 89 T.C. 816, 827 (1987). Petitioner bears the burden of proof. Rule 142(a).

In resolving questions of debt versus equity, courts have identified and considered various factors. See *Dixie Dairies Corp. v. Commissioner,* 74 T.C. 476, 493 (1980), and cases cited therein; see also *Anchor National Life v. Commissioner,* 93 T.C. 382, 400 (1989). Some of those factors are as follows: The names given to the certificates evidencing the indebtedness; presence or absence of a fixed maturity date; source of payments; right to enforce payments; participation in management as a result of the advances; status of the advances in relation to regular corporate creditors; intent of the parties; identity of interest between creditor and stockholder; thinness of capital structure in relation to debt; ability of corporation to obtain credit from outside sources; use to which advances were put; failure of debtor to repay; and risk involved in making advances.

The identified factors are neither equally significant nor is any single factor determinative or relevant in each case. *Dixie Dairies Corp. v. Commissioner, supra* at 493-494. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." *Estate of Mixon v. United States,* 464 F.2d 394, 403 (5th Cir. 1972). "The various factors * * * are only aids in answering the ulti-

mate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty Co. v. United States,* 398 F.2d 694, 697 (3d Cir. 1968). We have stated that the ultimate question is, "was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" *Litton Business Systems, Inc. v. Commissioner,* 61 T.C. 367, 377 (1973); see also *Dixie Dairies Corp. v. Commissioner, supra* at 494.

The fact that the debtor and creditor are related parties does not preclude the existence of a bona fide debt. *Gooch Lumber v. Commissioner,* 49 T.C. 649 (1968). However, the form of the transaction and the labels parties place on the transaction may not have as much significance when the corporation is closely held because the parties can mold the transaction at their will. *Fin Hay Realty Co. v. United States, supra* at 697.

Applying the above factors, we find that the $284,569 in advances from petitioner to Stabiflex, Inc., were capital contributions and not bona fide loans. There were no principal or interest payments and there was no evidence that the obligations in fact bore interest. If a lender does not insist upon interest payments, it may be appropriate to conclude that he is interested in the future earnings of the corporation or its increased market value. "Such a disinterest in interest points to a 'contribution to capital conclusion.' " *Segel v. Commissioner, supra* at 833; see also *Matter of Larson,* 862 F.2d 112, 117 (7th Cir. 1988).

Petitioner did not establish the existence of formal debt instruments or fixed maturity dates for repayment of the advances, or that there were agreements as to security. This places significant doubt upon whether these advances were bona fide debts. *Matter of Larson, supra; Kean, Transferee v. Commissioner,* 91 T.C. 575, 595-596 (1988); *Hardman v. United States,* 827 F.2d 1409, 1413 (9th Cir. 1987).

Another significant indication that the advances by petitioner and M&W Dortmund were capital contributions is the fact that they were made in proportion to their

interest in the venture. *Arlington Park Jockey Club v. Sauber*, 262 F.2d 902, 906 (7th Cir. 1959); *Charter Wire, Inc. v. United States*, 309 F.2d 878, 880 (7th Cir. 1962); *Segel v. Commissioner, supra* at 830. Petitioner and M&W Dortmund each owned a 50-percent interest in Stabiflex, Inc., and they agreed to and did make equal advances to the corporation.

It is also probative that M&W Dortmund's "loans" were included in the buy-out when its interest in Stabiflex, Inc., was "cashed out." Once M&W Dortmund sold its interest in Stabiflex, Inc., there was no longer an economic reason for it to maintain its loans. There were no notes evidencing a debt, no collateral securing the debt, no interest payments being made, and no requirement that the loan be repaid at a time certain. In contrast, a secured creditor who was receiving a reasonable return on the loans and who was to be repaid at a time certain would have ample reason to continue its creditor status. Thus, it would be difficult to find that the advances in this case were bona fide debt when petitioner, Stabiflex, Inc., and M&W Dortmund treated the "loans" in the same fashion as the capital contributions at the time M&W Dortmund sold its capital investment. There was also no evidence that Stabiflex, Inc., paid any interest to M&W Dortmund when the "loans" were repaid.

Moreover, the advances were made to Stabiflex, Inc., when it was experiencing financial problems, and it was unable to establish its own lines of credit or to borrow funds from banks without the guarantee of petitioner. "[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms." *Segel v. Commissioner*, 89 T.C. at 828; see also *Matter of Larson*, 862 F.2d at 117. We find that as an economic reality the advances in the instant case were placed at the risk of the business of the company and that it is unlikely that disinterested investors would have made loans to Stabiflex, Inc., on terms similar to those on which the advances were made.

Similarly, if the source of the corporation's repayments is dependent upon the earnings of the business, then the advances are indicative of capital contributions. In such a

case, the "lender" acts "as a classic capital investor *hoping* to make a profit, not as a creditor expecting to be repaid regardless of the company's success or failure." *Matter of Larson,* 862 F.2d at 117. Here, Stabiflex, Inc., was unprofitable when petitioner was making the advances. Petitioner expected that it would be repaid from Stabiflex, Inc.'s future earnings and profit. In this regard, Graegin testified that petitioner intended to be repaid "When Stabiflex was able to pay." Therefore, it is clear that repayment of the advances was dependent on the fortunes of Stabiflex, Inc.'s business, further indicating that petitioner was a "classic capital investor."

Petitioner places great weight on its professed intent to make loans to Stabiflex, Inc., and the fact that the advances were reflected as such in its and Stabiflex, Inc.'s books, records, and tax returns. In this regard, we rely upon the rationale of the court in *Road Materials, Inc. v. Commissioner,* 407 F.2d 1121, 1124 (4th Cir. 1969):

> The fact that the advances were entered as loans on the books kept by the taxpayer and [the corporation] does not conclusively prove they were loans. Nor was the Tax Court required to accept the testimony of the taxpayer's witnesses that it was the intention of the parties to create a debtor-creditor relationship. Intention to create a debt cannot be so readily proved. Generally it depends upon whether contemporaneous facts, not testimony given years later, establish an unconditional obligation to repay the advances. In litigated cases the issue often is not free from doubt, and decision must be based on analysis of the entire record. This is especially required when the nominal debtor and creditor are controlled by the same person, and the arm's length dealing that characterizes the money market is lacking. For this reason, the substance of the transaction is controlling, not the form in which it is cast or described. And, contrary to the taxpayer's claim, this is so even though the advances were evidenced by bookkeeping entries that [State] law recognizes as debt. [Citations and fn. ref. omitted.]

Accordingly, we hold that the advances are capital contributions rather than debts to which section 166 could apply. Our holding obviates the need to address respondent's alternative arguments with respect to the advances.

To reflect the foregoing and concessions of the parties,

*Decision will be entered under Rule 155.*