T.C. Memo. 2002-55


UNITED STATES TAX COURT


HENRY A. JULICHER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1102-99.                Filed February 27, 2002.


<u>Alan L. Frank</u> and <u>Robert A. Cohen</u>, for petitioner.

<u>Keith L. Gorman</u> and <u>John Gilbert</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency in

petitioner's 1994 Federal income tax of $95,727, an addition to

tax under section 6651(a)(1)[1] of $23,932, and an accuracy-

_____

[1] Unless otherwise noted, all section references are to the
Internal Revenue Code in effect for the year in issue, and all
Rule references are to the Tax Court Rules of Practice and
Procedure.

related penalty under section 6662(a) of $19,145. By amendment to answer, respondent asserted an increase in the deficiency. By motion at the end of trial to conform the pleadings to the evidence under Rule 41(b)(1), respondent asserted that petitioner is liable for a fraud penalty under section 6663 on the portion of the alleged underpayment attributable to a claimed casualty loss deduction.

We must decide the following issues:

Whether respondent is entitled under the circumstances of this case to amend his answer under Rule 41(b)(1) to assert fraud under section 6663. We hold that he is not so entitled. Having so held, we need not, and do not, address the question of whether petitioner is liable for fraud.

Whether petitioner is entitled to a casualty loss deduction in 1994 under section 165 with respect to the collapse of a portion of the roof of petitioner's warehouse. We hold that petitioner is not entitled to a casualty loss deduction because there was a reasonable prospect of recovery of insurance proceeds during 1994.

Whether, and to what extent, petitioner is entitled to a depreciation deduction during the year in issue. We hold that petitioner is entitled to a depreciation deduction in the amount claimed on his 1994 Federal income tax return, based on his

allocation of a portion of the purchase price to his basis in the depreciable property.

Whether petitioner is entitled to certain bad debt deductions under section 166 claimed on his 1994 return. We hold that he is not.

Whether petitioner is entitled to a tax return filing status of "married filing jointly" for the year in issue. We hold that he is not.

Whether petitioner is liable for an addition to tax and accuracy-related penalty as determined by respondent. We hold that he is.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and attached exhibits. At the time of filing the petition, petitioner resided in Wayne, Pennsylvania.

Petitioner's Businesses

Petitioner owned 100 percent of an S corporation, Julicher Sports Facilities (Julicher Sports). Julicher Sports engaged in the business of constructing sports facilities, with emphasis on surfaces such as tennis courts, weight room floors, artificial turf for football fields, ice-skating rinks, etc. In addition, petitioner leased real property to Julicher Sports and to Rose Weinstein, both discussed in greater detail below.

Casualty Loss and Depreciation Deductions

Petitioner owned real property at 10 Balligomingo Road, West Conshohocken, Pennsylvania (Property). The Property consisted of 6.836 acres with improvements, including three buildings, which were referred to at trial as the north building (7,839 square feet), the finger building (2,959 square feet), and the south building (9,324 square feet). The majority of the land was unimproved, and consisted of a creek and adjoining flood plain and steep slopes. In addition, the neighboring landowner held access and maintenance easements over the Property.

The south building consisted of three sections that we shall refer to as the western section, the middle section, and the eastern section. The three sections were separated by walls. During the year in issue, petitioner leased the south building to Julicher Sports and to other acquaintances and business associates, as a warehouse. On both his 1993 and 1994 Federal income tax returns, petitioner reported rental income from the foregoing leasing activities.

Petitioner acquired the Property, including land and improvements, on April 14, 1988, for a purchase price of $393,378.[2] In order to finance the purchase, petitioner obtained

---

[2] Petitioner's wife at the time, Melanie Julicher, was also a purchaser, but in 1991 she transferred her interest in the Property to petitioner. For convenience, we shall refer to
(continued...)

a loan of $500,000 from a bank, which was secured by a first mortgage. In a document from the loan officer to the bank's loan committee recommending approval of the loan, the loan officer stated:

> Although property in question is an old one and in considerable need of repair, the property should be desirable when rehabilitated and will have substantial value.

> With the potential rental income combined with the rent saving of Julicher, cash flow should be adequate to service the debt.

Petitioner used the balance of the loan over the purchase price to make repairs to the buildings on the Property. Petitioner did not increase his basis in the buildings by the amount of these repairs. Petitioner bought the Property because he had lost his lease on a previous location where his corporation conducted its business, and the buildings on the Property were suitable for use in the corporation's business.

Petitioner allocated $107,759 of the purchase price to the land and $285,619 to the buildings. Petitioner took depreciation deductions on the buildings beginning in April 1988 using a basis for depreciation of $285,619, the straight-line method, and a recovery period of 31.5 years.[3] Through 1993, petitioner had

---

[2](...continued)
petitioner as the only purchaser.

[3] Petitioner did not allocate basis individually among the
(continued...)

claimed depreciation deductions for the buildings of $9,068 per year[4] (prorated for the partial year 1988).  In 1994, petitioner claimed depreciation for the buildings of $4,179.

In 1988, petitioner was issued a citation from the Borough of Conshohocken indicating there was an actual and immediate danger of collapse of part of the south building.  In 1992, the eastern section of the south building suffered water damage caused by sprinklers that were set off as a result of a fire in a building on the land adjacent to the Property.  The cost of any repairs or improvements resulting from these incidents, or the cost of any other repairs or improvements, was not added to the buildings' basis.

In the fall of 1993, petitioner sought to reduce the tax assessment on the Property.  In his request for a lower assessment (assessment request), petitioner stated that he purchased the Property in 1988 for $373,000 and that his opinion of the market value of the Property at the time of the assessment request was $350,000.  In the assessment request petitioner claimed:  "There are currently about 20,000 SF [square feet] of

---

[3](...continued)
buildings at the time of purchase and did not claim separate depreciation deductions for each building; rather, petitioner claimed one composite depreciation deduction for all the buildings, based on the composite basis figure.

[4] The basis figure of $285,619 divided by a recovery period of 31.5 years yields a yearly deduction of $9,067.27.

dilapidated leaky buildings on the site of which 12,000 SF is over 100 years old. The buildings are in poor condition and in fact only 8,000 SF is even safe to use as warehouse."[5] In November 1993 the local board of assessment appeals rejected the assessment request.

On March 7, 1994, a part of the roof of the western section of the south building collapsed. The roof was supported by wooden trusses, which showed evidence of rot and decay at the time of the collapse. During the period leading up to the collapse, the roof of the south building was covered with ice and snow from extensive storms in the area.

At the time of the collapse, Julicher Sports maintained insurance on the buildings on the Property through Atlas Assurance Company (Atlas). The insurance policy lists only "CORPORATION" (i.e., Julicher Sports) as the "NAMED INSURED"; but both Julicher Sports and petitioner are listed at the top of the policy as follows:

> JULICHER SPORTS FACILITIES,
> INC., HENRY JULICHER, SPORT [sic]
> PO BOX 720, 10 BALLIGOMINGO RD
> W. CONSHOHOCKEN PA 19428

The policy, which was obtained in 1993, provided replacement coverage for the north, finger, and south buildings collectively

---

[5] We note that the square footage of the north building was 7,839, and the square footage of the south building (9,324) and finger building (2,959) totaled 12,283.

up to a limit of $852,000, subject to certain coinsurance.  The policy also covered damage to personal property owned by the insured and used in the insured's business.

Following the roof collapse, petitioner engaged Len Orloff of Claims International, Inc., to submit to Atlas a claim of loss from the collapse.  On April 27, 1994, Mr. Orloff submitted a claim to Atlas on behalf of Julicher Sports.  The claim reflects an estimated cost of damage to the south building of $68,365 and to its contents of $172,177, for a total of $240,542.  To provide the estimate for the south building itself, Mr. Orloff engaged an independent builder who prepared a written estimate of the cost of repairing the building.

Atlas raised questions about the validity of the contents claim as initially submitted because certain items claimed thereon appeared duplicative of earlier losses submitted in connection with a previous incident or otherwise appeared unfounded.  As a result of concerns expressed by Atlas, petitioner's adjuster submitted a revised inventory that reduced the contents damage claim from $172,177 to $70,095.  The damage claim with respect to the building remained $68,365.

Atlas subsequently requested a sworn proof of loss, which petitioner's adjuster submitted on his behalf in October 1994. The sworn proof of loss included the revised inventory claim of $70,095 and the original claim for damage to the building of

$68,365, totaling $138,460 less a deductible of $1,000. Sometime during the fall of 1994, the zoning and building official for the Borough of West Conshohocken, William Keil, learned of the roof collapse. After inspecting the south building, Mr. Keil determined that the collapse required the western section of the south building to be either promptly repaired or demolished. Mr. Keil also determined that the middle and eastern sections of the south building were not affected by the collapse and did not require immediate repair or removal. However, Mr. Keil believed that, independent of the collapse of the roof of the western section, the roofs of the middle and eastern sections were not safe for persons to stand on, and he notified the borough fire chief that, in the event of a fire in the south building, firemen should not go onto the roof of, or into, any section of the south building. Nonetheless, during a later visit to the Property, Mr. Keil observed a landscape contractor using the middle section of the south building for equipment storage.

In accordance with his inspection of the south building, in a letter dated November 17, 1994, Mr. Keil informed petitioner that petitioner was required to repair or remove the damaged section of the south building within 30 days of the receipt of the letter. Mr. Orloff replied to Mr. Keil in a letter dated December 21, 1994, indicating that petitioner intended to restore

the building to a safe condition upon receipt of insurance proceeds from Atlas. Mr. Orloff further indicated that appraisal was being sought with respect to the insurance claim. Mr. Orloff believed the 30-day limit prescribed by the November 17 letter was not likely to be strictly enforced.

At some point during 1994, Atlas offered petitioner $22,000 for damage to the south building, but nothing for the contents; petitioner rejected this offer. After the offer was rejected, petitioner requested an "appraisal", a formal procedure authorized in the insurance policy designed to resolve disagreements between insurer and insured as to the amount of damages from a particular loss. In this procedure, each party to the insurance policy nominates an appraiser, and the two appraisers select an independent party who reaches a value of the loss binding on both parties. From December 1994 until at least February 1995, petitioner made repeated requests for appraisal. Atlas did not respond to those requests, and informed petitioner in February 1995 that petitioner's claim was not ripe for appraisal, primarily because Atlas had concluded that petitioner was not entitled to coverage at all under the policy.

In March 1995, William Stewart (Mr. Stewart), an attorney representing Atlas, conducted an examination under oath of petitioner with respect to his claim for coverage arising from the roof collapse. After the examination, in a letter to

petitioner in May of 1995, Mr. Stewart informed petitioner that Atlas was denying coverage. This letter (denial letter) alleges, as the primary reason for denying coverage, that Julicher Sports or its representatives had misrepresented or concealed material facts concerning the loss. The denial letter further alleges that, among other things, Julicher Sports overvalued, and overstated the quantity of, the damaged property, misrepresented the obsolescence of damaged property, and misrepresented the condition of the building prior to the collapse. In addition to misrepresentation, the denial letter alleges other grounds for denying coverage, including certain exclusions in the policy and the policy's coinsurance provision.

Following the denial letter, on or about July 24, 1995, petitioner and Julicher Sports initiated a lawsuit against Atlas in Federal District Court. The complaint filed in the lawsuit asserts that the value of plaintiffs' loss due to the roof collapse was $138,460[6] and claims damages of $137,460 (the asserted value of the loss minus $1,000 deductible).

Atlas, through Mr. Stewart, responded by filing an answer to the complaint, a counterclaim against petitioner and Julicher Sports, and joinder complaints against unrelated third parties.

---

[6] Although the complaint does not describe how this amount was determined, we note that it is the same as in the sworn proof of loss; i.e., the sum of the second contents claim of $70,095 and the original claim for damage to the building of $68,365.

The answer lists nine affirmative defenses, most of which follow along the lines of the reasons for denial provided in the denial letter. The lawsuit was eventually settled by agreement of all the parties thereto.[7] In the settlement, no party admitted or conceded liability, and no damages were awarded.

The western portion of the south building was torn down in 1996. The middle and eastern portions of the south building were not torn down.

Petitioner filed his 1994 Federal income tax return (the 1994 return) on April 26, 1996. The 1994 return was due to be filed on October 15, 1995. Petitioner's accountant, Charles Finder, began preparing the 1994 return sometime in 1995. In November or December 1995, petitioner gave Mr. Finder a document for use in preparing the 1994 return. This document provides brief descriptions of some of the buildings on the Property, and claims that two masonry buildings, exceeding 50 years of age and with a combined value of approximately $154,000, were damaged by the collapse in 1994. It further claims that the value of the damaged buildings after the collapse was zero. Mr. Finder relied on the document in preparing the 1994 return. On Form 4684, Casualties and Thefts, of the 1994 return, petitioner claimed a casualty loss in connection with the collapse. The Form 4684

---

[7] The record does not disclose the date of the settlement.

states a basis for the damaged building of $155,836 and states
that the fair market value of the damaged building before
casualty was $154,000, and after casualty was $0.[8]  The Form 4684
claims a total casualty loss of $155,836.[9]

Respondent's examination in the instant case commenced prior
to July 22, 1998.  During the examination, Mr. Finder submitted
the document petitioner had given him to the revenue agent
conducting the examination to support the claimed deduction.

In the notice of deficiency, respondent determined that
petitioner was not entitled to the claimed loss deduction because
he did not (1) establish the decrease in the fair market value of
the Property as a result of the roof collapse, (2) establish his
adjusted basis in the Property, and (3) provide documentation to
support the claimed deduction.

Bad Debt Deduction (Ms. Weinstein)

In addition to leasing buildings to his corporation,
petitioner also leased real property to successive businesses
owned by Rose Weinstein (Ms. Weinstein), a professional tennis
instructor.  The businesses operated swim and tennis clubs.
The businesses paid annual rents to petitioner ranging from

---

[8] The record does not reflect how these figures were
generated.

[9] Because the building was alleged to have been totally
destroyed, the Form 4684 uses the stated basis as the casualty
loss deduction, even though that amount exceeded the stated value
of the south building of $154,000.  See sec. 1.165-7(b)(1)(ii),
Income Tax Regs.

$60,000 to $80,000, including $60,000 in 1994.  One of these businesses, a corporation called Indian Falls Racquet Club (Indian Falls), experienced financial difficulties soon after it opened.  Ms. Weinstein borrowed money from petitioner in order to keep Indian Falls running.

Petitioner lent the money in installments of irregular amounts at irregular intervals, over a period of approximately 8 months.  There was no formal agreement as to the terms of a loan; rather, it was understood that Ms. Weinstein would pay back the amounts as soon as possible.  She did not pay back any of the amounts, and petitioner continued lending additional amounts until the total grew to $44,000.  Eventually, on August 23, 1989, she and petitioner formalized the existence of the debt and established a repayment schedule with a document entitled "Loan Agreement".  The Loan Agreement provides for a loan from petitioner to Ms. Weinstein of $44,000 for a period of 3 years at 10 percent interest.

Indian Falls was a seasonal business, opening April 1 and closing after Labor Day each year.  At the end of each season up to and including 1993, Ms. Weinstein did not make a profit from Indian Falls, and the income she received from offering tennis lessons (separate from Indian Falls's business) was sufficient only to maintain her standard of living.  In each year from 1989 through 1993, after the close of Indian Falls for the season, Ms.

Weinstein told petitioner she was insolvent and that she could not repay the loan.

In January of each year, Ms. Weinstein sought additional funding in order to maintain the financial condition of Indian Falls to ensure it could open in April.  In January 1994, however, Ms. Weinstein was unable to obtain the additional funding necessary to open in the spring.  Thus, Indian Falls ceased doing business in January 1994.  However, in July 1994 Ms. Weinstein obtained sufficient funding to begin a new business operating a swim and tennis club, which was essentially the same business as Indian Falls, operating at a different site.  This business was operating as of the end of 1994.  At some point during 1994, petitioner told Ms. Weinstein that if she did not pay him the $44,000 she owed, he might sue her to recover.

On Schedule E, Supplemental Income and Loss, of the 1994 return, petitioner reported rental income of $143,059, a portion of which was received from Ms. Weinstein.  Also, on Schedule E, petitioner claimed a bad debt deduction of $44,000 by listing that amount as an item of expense with respect to the rental income.[10]

---

[10] Petitioner's accountant, Mr. Finder, believed it was correct to claim the bad debt deduction on the schedule reporting the rental income from Ms. Weinstein's business, since the bad debt, in his view, was directly related to rental operations.

In the notice of deficiency, respondent determined that petitioner was not entitled to the claimed bad debt deduction because he did not (1) establish a business purpose for the loss, (2) show that the loss resulted from a bad debt and in particular his bad debt, and (3) show that all reasonable steps were taken to collect the debt.

## Bad Debt Deduction (Attieh Bros.)

In 1987 Julicher Sports was engaged by Attieh Bros. Co. (Attieh Bros.), a family-owned business in Amman, Jordan, to install the rink and other flooring materials for a skating rink called the Skating Palace in Amman. Attieh Bros. paid Julicher Sports approximately $150,000 for the installation. Petitioner developed a close relationship with the Attieh family, in particular the brothers Thair and Nidal Attieh and their father Raouf, and soon he was treated as if he were a member of the family. Raouf was a commercial attaché for the Jordanian Government with ties to the King of Jordan, and petitioner felt he would be a valuable business contact in Jordan.

On October 15, 1989, petitioner individually (i.e., not Julicher Sports) and Attieh Bros. entered into a loan agreement (First Loan Agreement) whereby petitioner would lend Attieh Bros. $50,000 for a period of 5 years, to be repaid on or before October 15, 1994. The money was to be used to add a franchise restaurant to the Skating Palace. The First Loan Agreement

provides for 25 percent interest per year and calls for quarterly payments of interest only (i.e., no principal) in the amount of $3,125 beginning January 15, 1990, and ending at the end of the loan term, October 15, 1994. The First Loan Agreement also provides for fees in the event of late payments.

At some point after January 15, 1990, Attieh Bros. made the first payment called for by the First Loan Agreement. Sometime around March 1990, members of the Attieh family asked petitioner to lend Attieh Bros. an additional $20,000. Petitioner agreed, and he sent Nidal Attieh a letter dated March 28 outlining the terms of a new agreement under which the $20,000 would be added to the previous principal of $50,000. Petitioner subtracted from the $20,000 certain amounts, totaling $8,000, that he felt were owed him: $3,925 for video games he had purchased on behalf of Attieh Bros.; $3,125 for the next quarterly payment under the First Loan Agreement, which was due April 15, 1990; and $950 in late fees and interest arising from the untimeliness of the January 15, 1990, quarterly payment. At some point in late March or early April, petitioner sent Attieh Bros. the additional $12,000.

On April 2, petitioner and Attieh Bros. entered into a loan agreement (Second Loan Agreement) that replaced and superseded the first, providing for a principal amount of $70,000 (original $50,000 plus additional $20,000), with an interest rate of 25

percent per year and a term of 5 years ending April 15, 1995. The Second Loan Agreement calls for quarterly payments of interest in the amount of $4,375, plus concurrent quarterly payments of principal in the amount of $3,500, for a total of $7,875 each quarter. The first such payment was due July 15, 1990.

Neither Attieh Bros. nor the Attiehs made this payment or any other payment due under the Second Loan Agreement, with the exception of $1,500 paid to petitioner in July 1991. Beginning July 31, 1990, and continuing periodically for the next several years, petitioner sent telefax correspondence to Thair, Nidal, or Raouf Attieh inquiring about the lack of payment and requesting payment.[11] The Attiehs replied sometimes with explanations for their failure to pay (such as the Gulf War, which, according to the correspondence, reduced business and limited the ability to transfer money out of Jordan) and sometimes with promises to begin paying after money became available from a new source, such as the sale of property.[12] The correspondence reflects petitioner's mounting frustration at receiving virtually no payments on the loan.

---

[11] The record contains seven faxes from petitioner in 1990, two in 1991, seven in 1992, and one in 1993. The record contains no faxes sent in 1994 or later.

[12] The record contains four faxes from the Attieh family in 1990, five in 1991, two in 1992, and two in 1993. The record contains no faxes sent in 1994 or later.

From the period the loan was made through the year in issue, the Attiehs advised petitioner that they intended to repay the loan.  In a fax dated August 3, 1993, Thair informed petitioner that the Attiehs would begin paying $2,000 per month starting September 15, 1993, which was repeated in a fax dated August 19, 1993.  During this period and through the time of trial, Thair and petitioner spoke often on the telephone.  Petitioner remained in a close personal relationship with the Attiehs and occasionally sought further business dealings with them.

The Skating Palace operated as a going concern until at least 1998.

On the 1994 return, petitioner claimed a bad debt deduction of $70,000.  In the notice of deficiency, respondent determined that petitioner was not entitled to the claimed bad debt deduction because he did not (1) establish a business purpose for the loss, (2) show that the loss resulted from a bad debt and in particular <u>his</u> bad debt, and (3) show that all reasonable steps were taken to collect the debt.

<u>Joint Filing Status</u>

On their 1993 joint Federal income tax return, petitioner and his wife at the time Margit Julicher (Mrs. Julicher) selected "married filing joint" status.  Petitioner, Mrs. Julicher, and Mr. Finder (as return preparer) signed the 1993 return.  On the 1994 return, petitioner selected "married filing separate"

status. Petitioner and Mr. Finder (as return preparer) signed the 1994 return.

In late 1997 or early 1998, during the examination of petitioner's 1994 taxable year, Mr. Finder, petitioner's authorized representative before the Internal Revenue Service, met with the revenue agent conducting the examination, Venita Lucas. In one of the meetings, which took place before February 6, 1998, Mr. Finder raised an issue with respect to a net operating loss carryback deduction. Mr. Finder discussed the net operating loss with Ms. Lucas, and Ms. Lucas requested from Mr. Finder a Form 1040 (1994 Form 1040) to be used in claiming the net operating loss deduction. Mr. Finder tendered the requested 1994 Form 1040, and Ms. Lucas informed him that he should consider it filed. The 1994 Form 1040 reflects a filing status of "married filing joint". The "label" field of the 1994 Form 1040 contains petitioner and Mrs. Julicher's names, and both petitioner's and Mrs. Julicher's Social Security numbers are contained on the 1994 Form 1040. Mr. Finder said nothing to Ms. Lucas with respect to the "married filing joint" filing status of the 1994 Form 1040. The 1994 Form 1040 was not signed by petitioner, Mrs. Julicher, or Mr. Finder, and contains no inscription to the effect of its being an amended return.

The notice of deficiency in this case was issued to petitioner only. Attached to the notice was Form 4549, Income

Tax Examination Changes, prepared by Ms. Lucas and dated March 6, 1998. The Form 4549 used "Married - Separate" filing status in computing the amount of the adjustments to income.

OPINION

<u>Respondent's Motion To Amend the Pleadings</u>

At the conclusion of the trial, respondent moved to amend the pleadings to conform to the evidence under Rule 41(b)(1). In his motion, respondent argues that he should be permitted to assert a fraud penalty under section 6663 against petitioner on the basis that the issue of fraud had been tried by consent of the parties. Respondent contends that petitioner committed fraud by claiming a casualty loss deduction to which he knew he was not entitled, by falsely claiming that the Property's south building had been completely destroyed and providing false information regarding the building's value. We shall deny respondent's motion to amend the pleadings.

The granting of a motion to conform the pleadings to the evidence is within the discretion of the Court, tempered by sound reason and fairness. <u>Federated Graphics Cos. v. Commissioner</u>, T.C. Memo. 1992-347. Our review of the entire record in this case convinces us that respondent was aware before trial of the essential facts upon which his assertion of fraud is based. This is demonstrated by an examination of respondent's specific allegations. Respondent relies primarily on the document

petitioner gave to his accountant in support of the claimed casualty loss deduction.  Respondent notes petitioner's claim in the document of a loss of about $156,000 resulting from damage to two buildings that rendered them completely useless, compared with petitioner's claim in the lawsuit against Atlas of a loss of about $68,000 resulting from damage to one building.  However, respondent discussed this discrepancy in his trial memorandum, which was served on petitioner more than 2 weeks before trial.

As further support for fraud, respondent cites the discrepancy between petitioner's claim in the document given to his accountant that the Property's two masonry buildings were over 50 years old and rendered useless by the collapse, with petitioner's claim in a document given to the local board of property assessment appeals (before the collapse) that the same buildings were over 100 years old and not safe for use.  However, respondent almost certainly had both documents before trial.  The document petitioner gave his accountant had, at a minimum, been exchanged prior to trial,[13] and the document given to the board of assessment appeals was mailed to respondent's counsel more than 2 weeks before trial.

---

[13] Respondent did not cite any failure to receive this document in advance of trial when petitioner sought to have it admitted, whereas respondent did object to several other documents on this ground.

Respondent also cites the discrepancy between (i) petitioner's claim in the document given to his accountant and in his petition that the buildings in issue were valuable before, and useless after, the claimed casualty, and (ii) the testimony of Mr. Keil, the building inspector, to the effect that the buildings in question were being used after the roof collapse. But Mr. Keil was respondent's witness, and his testimony was characterized in respondent's trial memorandum as concerning the buildings' condition before and after the claimed casualty. Thus respondent knew prior to trial that he had an independent witness to contradict petitioner's various assertions that the buildings were rendered useless by the claimed casualty.

We conclude that the essential facts on which respondent bases his allegations of fraud were known to respondent's counsel prior to trial. Under the circumstances of this case, the failure to give notice to petitioner that he was required to defend against fraud results in significant prejudice. Cf. Pallante v. Commissioner, T.C. Memo. 1989-334 (counsel for respondent sought amendment to pleadings to assert fraud after trial, based on facts known prior to trial). While there is evidence in the record that might support a finding that petitioner committed fraud, petitioner was entitled to notice and an adequate opportunity to rebut respondent's evidence. Accordingly, respondent's motion to amend is denied.

Casualty Loss Deduction

Respondent determined that petitioner is not entitled to a casualty loss deduction of $155,836 claimed on the 1994 return. We sustain respondent's determination for the reasons discussed below.

Section 165(a) permits a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." There is no question that the collapse of a portion of the roof of the south building occurred in 1994 and was not compensated for by insurance or otherwise. However, the deduction under section 165 is allowed only for the year in which the loss is "sustained", as defined in section 1.165-1(d), Income Tax Regs. Because we find that the loss in the instant case was not sustained in 1994, the only year before us, we conclude the deduction is not allowable in that year.

A loss is sustained when it is evidenced by closed and completed transactions and fixed by identifiable events. Sec. 1.165-1(d)(1), Income Tax Regs. If the taxpayer has a claim for reimbursement of a casualty loss and there is a reasonable prospect of recovery, the casualty loss is not sustained until it can be ascertained with reasonable certainty whether or not the

reimbursement will be received.  Sec. 1.165-1(d)(2)(i), Income Tax Regs.[14]

Petitioner had a claim for reimbursement in this case.  The buildings were insured for replacement costs of up to $852,000 and petitioner had submitted a claim that was pending as of the close of the taxable year at issue.[15]  Thus, we must decide whether petitioner had a reasonable prospect of recovery. Whether the taxpayer has a reasonable prospect of recovery is a question of fact.  Boehm v. Commissioner, 326 U.S. 287, 292-293 (1945); Estate of Wagner v. Commissioner, T.C. Memo. 1998-338. We rely on objective facts primarily, but the taxpayer's

---

[14] Respondent disputes whether the roof collapse was a casualty within the meaning of sec. 165, arguing that the collapse resulted from the slow deterioration of the roof trusses, and thus lacked the requisite suddenness to qualify as a casualty.  See Maher v. Commissioner, 76 T.C. 593 (1981), affd. 680 F.2d 91 (11th Cir. 1982).  Neither party produced admissible expert testimony on the cause of the collapse.  Assuming arguendo that the collapse constituted a casualty, it still must be shown that there was no reasonable prospect of recovery during the year in issue before petitioner would be entitled to the claimed deduction.  Because we hold that there was a reasonable prospect of recovery during the year in issue, we need not, and do not, decide whether the collapse was a casualty.

[15] Although Julicher Sports, rather than petitioner, was the named insured, petitioner does not argue that he had no claim for reimbursement and therefore that he, as the only petitioner in the instant case, should be entitled to a casualty loss deduction.  Indeed, petitioner owned the building and joined in the lawsuit against Atlas.  Moreover, Mr. Stewart, Atlas's attorney during the investigation of the claim, testified that Atlas would have been "hard pressed" to deny coverage to petitioner on the ground that he was not the named insured, since his name was on the insurance policy in conjunction with the name of Julicher Sports.

subjective beliefs are also relevant.  Estate of Wagner v. Commissioner, supra; see Boehm v. Commissioner, supra; see also Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 812 (1974), affd. 521 F.2d 786 (4th Cir. 1975).  Denial of liability by an insurance company is one factor in deciding whether a reasonable prospect of recovery exists, but not the sole factor.  Gale v. Commissioner, 41 T.C. 269, 276 (1963).  The fact that a taxpayer files a lawsuit to recover the loss gives rise to an inference of a reasonable prospect of recovery.  Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), affg. T.C. Memo. 1979-479.

The evidence in this case shows that petitioner had a reasonable prospect of recovery in 1994 with respect to his claimed casualty loss.  Although Atlas developed suspicions regarding petitioner's contents claim, Atlas sought a sworn proof of loss in October 1994.  At some point Atlas offered $22,000 with respect to the damage to the building.  Petitioner rejected it and was seeking to invoke an appraisal as of December 1994. On December 21, petitioner intended to make repairs to the building once the insurance proceeds were received.  Petitioner was still pursuing his claim in March 1995, when he gave testimony in an examination under oath with a representative of Atlas.  There was no denial of coverage by Atlas until May 1995. Further, petitioner and Julicher Sports filed suit against Atlas in July 1995, asserting that petitioner was entitled to $137,460,

a figure that encompassed his claim of damage to the building.[16] Atlas filed its answer and counterclaims in August of that year. Some time thereafter, the lawsuit was settled, with no damages awarded.[17]

Based on the foregoing, we find that not only did petitioner believe he had a reasonable prospect of recovery at the end of 1994, he in fact had a reasonable prospect of recovery with respect to the building damage at the end of that year. Thus, we sustain respondent's disallowance of the deduction for 1994.

Depreciation Deduction

Petitioner claimed a depreciation deduction with respect to the Property's buildings of $4,179 for 1994. In an amendment to answer, respondent asserted an increase in deficiency on the ground that petitioner was not entitled to the claimed depreciation. Respondent concedes he has the burden of proof on this issue. See Rule 142(a). We hold that petitioner is entitled to the depreciation deduction as claimed.

In support of his position, respondent argues that petitioner improperly allocated basis between the Property's

---

[16] As noted in our Findings of Fact, the amount claimed by petitioner in the lawsuit against Atlas is the sum of the repairs estimated for the building ($68,365) and the amount of contents damage asserted in the second claim ($70,095). Thus, petitioner's averments included a claim for compensation with respect to damage to the building.

[17] The date of the settlement is not in the record, although it clearly occurred sometime after August 1995.

buildings and land.  When depreciable and nondepreciable property are acquired together for a lump-sum purchase price, the regulations under section 167 require basis to be apportioned based on relative value at the time of purchase.  Sec. 1.167(a)-5, Income Tax Regs.  Under the regulation, the ratio of (i) the portion of the purchase price allocated as basis of the depreciable property to (ii) the total purchase price cannot exceed the ratio of (a) the value of the depreciable property to (b) the value of the entire property.  Id.  Of the total purchase price of $393,378, petitioner allocated $285,619 as basis in the depreciable property, i.e., the buildings; thus, under petitioner's allocation the value of the buildings equaled approximately 73 percent ($285,619 ÷ $393,378) of the value of the whole.  Respondent's argument is that the value of the buildings was proportionally less.  We find that respondent has failed to carry his burden of proof.

Respondent has not presented any appraisals or other specific evidence of the value of the buildings and land at the time petitioner purchased the Property.  Rather, respondent relies on more general evidence to cast doubt on petitioner's allocation, such as the fact that in 1988 (the year petitioner acquired the Property), petitioner was issued a citation because a portion of the south building was at risk of collapse.  Respondent's argument, essentially, is that the buildings had

little to no value and that petitioner bought the Property solely, or primarily, for the land.

There is substantial independent evidence demonstrating that respondent's basic premise, that the buildings had little to no value when acquired, is wrong. A loan officer for the bank extending a $500,000 loan for petitioner's purchase of the Property recommended approval of the loan, on the grounds that the buildings, although "old" and in "need of repair", could be rehabilitated to produce rental income to service the debt. Moreover, in 1993 an unrelated insurer issued a policy providing $852,000 in coverage for the buildings, and there was no evidence of substantial capital improvements to the buildings between the time of their acquisition by petitioner in 1988 and the issuance of the policy. We believe it is unlikely an insurer would have extended coverage of this magnitude for buildings of negligible value. In addition, the land contained steep slopes and a flood plain and was subject to maintenance and access easements held by petitioner's neighbor, the combination of which would suggest that any attempt to use the land in a configuration other than the one existing at the time would require considerable capital investment. Given the lack of evidence of relative value offered by respondent, we conclude that respondent has failed to carry his burden of showing that petitioner is not entitled to the depreciation deduction in the amount claimed on the 1994 return.

Bad Debt Deductions--Weinstein and Attieh Bros.

Petitioner claimed bad debt deductions for the amounts lent to Ms. Weinstein and Attieh Bros. In the notice of deficiency, respondent disallowed both deductions. Petitioner has the burden of proof. Rule 142(a).[18] We sustain respondent's determination on the ground that petitioner has not carried his burden of proving that the debts became worthless during the year in issue.

The initial step in establishing entitlement to a bad debt deduction is proof of a bona fide debtor-creditor relationship that obligates the debtor to pay a fixed or determinable amount. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 284 (1990); sec. 1.166-1(c), Income Tax Regs. A gift or contribution to capital is not a debt. Calumet Indus., Inc. v. Commissioner, supra; sec. 1.166-1(c), Income Tax Regs. We find that the loans at issue were genuine debts. In both cases, loan agreements providing for interest payments evidenced the existence of the debts. See Lerma v. Commissioner, T.C. Memo. 1995-586; sec. 1.166-1(c), Income Tax Regs. Moreover, Ms. Weinstein's business and Attieh Bros. were going concerns at the time the loans were made. See Lerma v. Commissioner, supra. Finally, the communications between both Ms. Weinstein and the Attiehs and

_____

[18] Sec. 7491 does not apply to this case because the examination commenced prior to July 22, 1998, the effective date of that section. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(1), 112 Stat. 726.

petitioner indicate that the parties to the loans intended genuine debts.  See id.

In order to be entitled to a bad debt deduction, petitioner must prove that each debt had value at the beginning of 1994 and became worthless during that year.  Milenbach v. Commissioner, 106 T.C. 184, 204 (1996).  There is no standard method to decide worthlessness within the taxable year; rather, each case depends on all its facts and circumstances.  Id.; Crown v. Commissioner, 77 T.C. 582, 598 (1981).  The year of worthlessness is generally fixed by identifiable events that form the basis for reasonable grounds for abandoning any hope of recovery.  Milenbach v. Commissioner, supra at 205; Crown v. Commissioner, supra at 598.

As for the Weinstein debt, we find petitioner has failed to prove that any part of it became worthless during 1994.  In testimony, petitioner justified claiming the deduction in 1994 merely on the basis that it had been 5 years since he had made the loan.  However, "the fact that accounts are overdue, standing alone, does not warrant deducting them as worthless."  Milenbach v. Commissioner, supra at 205.  Petitioner pointed to no identifiable event that provided reasonable grounds for abandoning hope of recovery of even a part of the debt in 1994.  Ms. Weinstein testified that she paid $60,000 in rent to petitioner in 1994, and Mr. Finder recalled that Ms. Weinstein's rent payments made up "the bulk" of the $143,059 in rental income

reported as one line item on the 1994 return. That rent was well in excess of the $44,000 debt Ms. Weinstein owed petitioner, suggesting her ability to pay. Moreover, even if Ms. Weinstein's successive businesses were "insolvent" at the end of each season, as she told petitioner, she maintained the businesses as going concerns, providing an apparent source from which to pay the debt. Cf. Riss v. Commissioner, 56 T.C. 388, 408 (1971) (even where liabilities of business exceed assets, fact that it continues to operate as going concern is evidence that its debts are not uncollectible), affd., revd. and remanded on another issue 478 F.2d 1160 (8th Cir 1973), affd. sub nom. Commissioner v. Transport Manufacturing & Equip. Co., 478 F.2d 731 (8th Cir. 1973). As respondent points out on brief, the fact that Ms. Weinstein's business, Indian Falls, failed in 1994, which might suggest that she no longer had a source of income to pay the debt, see Bowman v. Commissioner, T.C. Memo. 1995-259, is unavailing to petitioner here: Ms. Weinstein began a new business in July 1994. Thus, not only has petitioner failed to point to an identifiable event indicating the debt was uncollectible, the evidence shows that Ms. Weinstein had sources from which to pay the debt. Petitioner has failed to prove the Weinstein debt became worthless in 1994, and we sustain respondent's disallowance of the bad debt deduction.

As for the Attieh Bros. debt, we reach the same conclusion. Petitioner has not shown any identifiable event that occurred in 1994 which demonstrates the Attieh Bros. debt would not be repaid.[19] The most significant factor in our reaching this conclusion is the fact that the Skating Palace continued to operate as a going concern throughout 1994. See Riss v. Commissioner, supra. Petitioner twice on brief cites the failure of the Attieh Bros.' business in support of his bad debt claim, but the record establishes that the Skating Palace continued operation until at least 1998.

In addition, we find it remarkable that the extensive written correspondence, i.e., faxes, between petitioner and the Attiehs concerning the loan and its repayment ends abruptly in August 1993. The volume of this correspondence before 1993 demonstrates that it was petitioner's and the Attiehs' well-established practice to communicate by fax concerning the loan. They exchanged at least 11 such faxes in 1990, 7 in 1991, and 9 in 1992. Yet petitioner produced no faxes subsequent to an

---

[19] Respondent disputes the amount of the debt, arguing (1) that a portion of the $20,000 second loan amount was not part of the debt since it was held back to pay amounts already owed by the Attiehs to petitioner and (2) that a portion of both the $50,000 original loan and the $20,000 second loan was equipment rather than cash, and that petitioner, having failed to prove his basis in the equipment, would be denied a deduction under sec. 166(b). Because we hold the entire bad debt deduction to be disallowed because petitioner has not proven worthlessness during the year in issue, we do not address these arguments.

August 19, 1993 fax (in which the Attiehs represent that a payment will be made in September).  While it is clear that petitioner and the Attiehs remained in close contact through the time of trial, petitioner would have us believe that all contact with the Attiehs after the August 19, 1993, fax was oral only. On this record, we do not believe that the fax correspondence between petitioner and the Attiehs ceased in August 1993.  See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  We can conclude only that petitioner was either unable or unwilling to produce later faxes that might bear more directly on the prospects for recovery in 1994.[20]  Petitioner bears the burden of proving that the Attieh Bros. loan became worthless in 1994.  The last piece of documentary evidence shows that the Attiehs were still attempting to make repayment arrangements into September of 1993. Even if we believed no later faxes were sent, the testimony given by petitioner and Thair is too vague to provide any basis to conclude that the situation as documented in August 1993 specifically changed in 1994.  On this record, we conclude that petitioner has failed to show that the Attieh Bros. loan became worthless in 1994.

---

[20] The numerous instances in the record where petitioner gave conflicting statements in connection with the casualty loss have damaged his credibility with respect to all issues in the case.

Accordingly, we sustain respondent's determination disallowing the bad debt deductions claimed by petitioner in 1994.

Filing Status

Petitioner argues that he is entitled to joint filing status (and the rates under section 1(a)) in accordance with section 6013(b), because the 1994 Form 1040 constitutes a joint income tax return filed by petitioner and Mrs. Julicher after he filed separately for taxable year 1994.[21]  Respondent argues that the 1994 Form 1040 relied on by petitioner is not a valid joint return and consequently that petitioner did not elect to make a joint return prior to the issuance of the notice of deficiency.[22] We agree with respondent.

Section 6013 in general entitles married taxpayers to make a joint income tax return.  See sec. 6013(a).  Section 6013(b)(1) further provides that even where a taxpayer has filed a separate

---

[21] Petitioner also argues that, because he elected to make a joint return under sec. 6013(b), the notice of deficiency is invalid because it was sent to him alone.  Because we conclude herein that petitioner has not validly elected to make a joint return under that section, this argument is likewise without merit.

[22] Respondent also asserts that this issue was not raised on a timely basis by petitioner but concedes there is no prejudice to him so long as the parties' stipulation characterizing the 1994 Form 1040 as an "amended return" is not treated as binding on respondent for purposes of this issue.  Since petitioner has not sought to rely on the stipulation for this purpose, we find no prejudice and shall decide the issue.

return for a taxable year and the time prescribed for filing has expired, the taxpayer may nevertheless make a joint return with his or her spouse, subject to specified limitations.  One such limitation is that the election to make a joint return may not be made after a notice of deficiency for the year at issue has been mailed to either spouse, if the spouse files a timely petition with the Tax Court.  Sec. 6013(b)(2)(C).  A joint return filed pursuant to section 6013(b)(1) constitutes the spouses' return for the taxable year.  Sec. 6013(b)(1).

Petitioner argues that the submission of the 1994 Form 1040 by his authorized representative to the revenue agent examining his 1994 taxable year, where the agent requested that it be submitted to her and represented that it should be considered filed, coupled with the failure of the Internal Revenue Service subsequently to advise petitioner that the 1994 Form 1040 had not been accepted, should constitute an election to make a joint return under section 6013(b).  We hold that no election was made, because the 1994 Form 1040 was not a valid joint return.

Entitlement to joint filing status requires the filing of a valid joint return.  Thompson v. Commissioner, 78 T.C. 558 (1982).  A return that is not signed by either spouse, as in the instant case, is not a valid return.  Olpin v. Commissioner, 270 F.3d 1297, 1300 (10th Cir. 2001), affg. T.C. Memo. 1999-426.  Thus, regardless of whether the submission of the 1994 Form 1040

to the examining agent herein constitutes filing, the document is not a valid joint return. Cf. Olpin v. Commissioner, supra (unsigned joint return is invalid return even though IRS had treated it as filed, processed it as joint return, and accepted payment of liability reflected thereon). Since the unsigned 1994 Form 1040 is not a valid return, petitioner failed to elect to make a joint return prior to the issuance of the notice of deficiency in this case. See sec. 6013(b)(2)(C).[23]

Petitioner appears to argue that various actions and/or inactions[24] by Internal Revenue Service personnel should constitute a waiver of the signature requirement. However, the signature requirement for purposes of a valid joint return may not be waived by Internal Revenue Service personnel. Olpin v. Commissioner, supra at 1301 ("acceptance cannot cure an invalid return"); see also Lucas v. Pilliod Lumber Co., 281 U.S. 245

---

[23] Sec. 6013(b)(2)(C) is currently codified as sec. 6013(b)(2)(B), effective for taxable years beginning after July 30, 1996. Taxpayer Bill of Rights 2, Pub. L. 104-168, sec. 402(a), 110 Stat. 1459 (1996).

[24] In addition to the arguments already noted, petitioner contends that the Internal Revenue Service failed to advise him that his attempt to claim joint filing status had not been accepted. In response, respondent points to the Form 4549, Income Tax Examination Changes, prepared by the revenue agent and dated Mar. 6, 1998, which is attached to the notice of deficiency. Respondent contends that the Form 4549, which employed a "Married - Separate" filing status, put petitioner on notice that his claim of joint filing status had not been accepted. The record in this case, however, does not establish that the Form 4549 was provided to petitioner prior to the mailing of the notice of deficiency.

(1930) (signature requirement may not be waived by IRS personnel for purposes of statute of limitations); Bachner v. Commissioner, 81 F.3d 1274, 1279-1280 (3d Cir. 1996) (to same effect); Doll v. Commissioner, 358 F.2d 713, 714 (3d Cir. 1966) (to same effect where purported joint return lacked signature of either spouse), affg. T.C. Memo. 1965-191.

Thus, we are satisfied that the 1994 Form 1040 was not a valid joint return, the notice of deficiency was properly issued to petitioner alone, and petitioner is not entitled to the income tax rates applicable to joint filers.

Addition to Tax and Accuracy-Related Penalty

In the notice of deficiency respondent determined an addition to tax under section 6651(a)(1) and an accuracy-related penalty under section 6662(a). In both his petition and his amended petition, petitioner assigned error with respect to respondent's determination of the deficiency, but he did not do so with respect to either the addition to tax or the accuracy-related penalty. Respondent, in a letter to petitioner initiating informal discovery before trial, and also in his trial memorandum, stated that these issues would be treated as conceded by petitioner because they were not mentioned in the petition. See Rule 34(b)(4). Petitioner, in his trial memorandum, asserted that the addition to tax and accuracy-related penalty were in dispute. Nonetheless, petitioner, on brief, still did not

address either the addition to tax or the accuracy-related penalty.[25] Thus, either because of petitioner's failure to assign error to these determinations in the petition, Rule 34(b)(4), or because petitioner has abandoned the issue on brief, see Zidar v. Commissioner, T.C. Memo. 2001-200 (citing Bradley v. Commissioner, 100 T.C. 367, 370 (1993)), we sustain respondent's determinations.

An Order and Decision will be entered denying respondent's oral motion to conform the pleadings to the proof, and decision will be entered for respondent with respect to the deficiency, addition to tax, and accuracy-related penalty, as set forth in the notice of deficiency, and for petitioner with respect to the increase in deficiency.

To reflect the foregoing,

An appropriate Order and

Decision will be entered.

---

[25] The only statement petitioner makes on brief with respect to these issues is to request a reduction in the deficiency and "a corresponding reduction in interest and penalties assessed thereon."